STATE OF CONNECTICUT *v.* OMAR R. ALI
(AC 26290)

Dranginis, Flynn and DiPentima, Js.

Argued September 20—officially released November 29, 2005

*Auden Grogins,* special public defender, for the appellant (defendant).

*James A. Killen,* senior assistant state's attorney, with whom, on the brief, were *Christopher Morano,*

chief state's attorney, *Scott J. Murphy*, state's attorney, *Gary W. Nicholson*, senior assistant state's attorney, and *Susan F. Filan*, assistant state's attorney, for the appellee (state).

*Opinion*

DRANGINIS, J. The defendant, Omar R. Ali, formerly known as Herbert Ross, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a) and felony murder in violation of General Statutes § 53a-54c. On appeal, the defendant claims that (1) the trial court improperly admitted evidence of uncharged misconduct concerning his prior drug use over a period of twenty years, (2) the court improperly admitted certain consciousness of guilt evidence concerning his use of a false name and (3) there was insufficient evidence to prove the crime of felony murder. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. At the time of the crime, the victim, Darrell Ashton, was a forty-four old year professional who lived alone in his Burlington home, where his boyfriend, Daniel Routhier, occasionally would spend the weekend. On Thursday, May 8, 1980, Ashton spent the evening at home with Routhier. The following morning, Ashton left for work at about 7:30 a.m. Routhier left Ashton's home at around 9:30 a.m., at which time he noticed that the house was in order and that both the stereo and television set were in their usual locations. Routhier had plans that weekend to get together with friends and did not return to Ashton's home. Later that evening, Ashton frequented a few different clubs in the Hartford area, including the Warehouse. Ashton was last seen alive by his friend, Peter Huybrechts, during the early morning hours of Saturday, May 10, 1980, at the Warehouse. Although Ashton was alone at the Warehouse,

he told Huybrechts that he was "hoping to meet someone to take home."

The following Sunday, May 11, 1980, Ashton's brother, William Ashton, and William Ashton's family arrived at Darrell Ashton's home to celebrate Mother's Day and noticed Darrell Ashton's dog running loose in the yard. When no one greeted them at the door, William Ashton and his family entered the unlocked house. The house was colder than usual for that time of year, and William Ashton immediately noticed that the television set was missing from its usual location. There was a light on in the bathroom and the cellar, but the bathroom door was locked. William Ashton went outside the house to look through the bathroom window and saw his brother's body in a "hunched over" position. William Ashton ran back into the house, kicked down the bathroom door, and discovered that his brother was not breathing and that there was blood everywhere. William Ashton's wife immediately called 911. Shortly afterward, an emergency medical technician and ambulance trainee arrived at the scene and confirmed that Darrell Ashton was dead.

During a subsequent police investigation, numerous pieces of evidence were discovered and preserved, including objects on which the defendant's fingerprints were found. Police also discovered that a television set and stereo equipment were missing. There was a crumpled sheet outside the bathroom that was wrapped around a bloodstained knife, which appeared to come from the knife block in the kitchen. On the floor of the bathroom, investigators found Darrell Ashton's wallet that contained items of identification but no money. Investigators collected more than ninety-nine fingerprints from the home. At the time of the initial investigation in 1980, the police did not yet have the automated fingerprint identification system (identification system), which is now commonly used to match finger-

prints. It was only after the state's fingerprint examiner pulled this "cold case" in 2000 and attempted to match the prints using the identification system that the defendant was identified. His fingerprints matched those left on a plate and on the molding of the bathroom doorjamb, and his palm print matched a bloody palm print found on the bathroom vanity in Darrell Ashton's home. DNA analysis also aided in the later investigation of this case. A mixture of DNA was extracted from a stain on the crumpled sheet found outside the bathroom. Both Darrell Ashton and the defendant had contributed genetic material to the stain. As part of the cold case investigation, the medical examiner reviewed the original autopsy report and concluded that Darrell Ashton had been punched, manually strangled and then stabbed eleven times, three times in the chest and eight in the back. On the basis of this most recent investigation, the police identified the defendant, who was currently living in Waterbury. Two investigators went to the defendant's residence and asked him to speak with them about Darrell Ashton's murder. The defendant voluntarily went with the investigators to police headquarters and gave a formal written statement, which included references to prior arrests and acts of misconduct. The defendant denied ever having been in Burlington. On August 8, 2003, the defendant was arrested and charged with murder in violation of General Statutes § 53a-54a (a) and with felony murder in violation of § 53a-54c. The associated felony was robbery or burglary connected with the theft of the television set, stereo equipment and any money that may have been taken from the wallet. At the conclusion of the state's case, the defendant moved for a judgment of acquittal on both counts, which was denied. The jury found the defendant guilty of murder and felony murder. At sentencing, the court merged the felony murder conviction with the murder conviction and sentenced the defen-

dant to twenty-five years to life imprisonment on the murder charge. This appeal followed. Additional facts will be set forth as necessary.

## I

The defendant's first claim is that the court abused its discretion by improperly admitting evidence of uncharged misconduct concerning his prior illegal drug use over a period of twenty years. We disagree.

The following facts are relevant to our resolution of that issue. During the course of the trial, the state offered as evidence portions of the written statement given by the defendant at police headquarters concerning his drug use.[1] The court held an evidentiary hearing, at which time defense counsel objected to the statements made by the defendant concerning uncharged misconduct that included drug use as an adult. After reviewing the evidence, the court ordered a redaction

---

[1] The following portions of the defendant's written statement concerning his prior drug use were offered into evidence. "Starting in 1968 or 1969 I became involved in the use of drugs. At this time, I was smoking a little weed. . . . During my time in the service I started to use and became addicted to heroin. . . .

"In 1978, I met Cynthia Hawley at a basketball game in Hartford, Connecticut. Together that same year, we moved to Queens, New York. On November 11th, 1978 I married Cynthia and together we had our first son on January 5th, 1980. At this time we were living at 2021 1118th, Avenue in Jamaica Queens, New York. We both worked in her father['s] real estate business called the Gold Point Reality. I received my real estate license in 1979. I separated from Cynthia in 1984, together we tried to get back together but separated again in 1985. The reason for the split was the cocaine use. We finally received a divorce in 1990.

"In 1986, I came back to Connecticut where I became involved with more drugs and narcotics. . . . I decided to go south to South Carolina. I went to Myrtle Beach and found a job working in construction as a labor foreman. I also met Marie and at the same time was still involved with cocaine. She had no idea that I was using cocaine.

\* \* \*

"At the times that I was using drugs I knew what I was doing, I have a vivid picture of what I was doing and knew what I was doing when I was high on drugs."

of the portion of the defendant's statement concerning his arrest and subsequent discharge from the armed forces for dealing drugs, but allowed the other references to his drug use to be introduced into evidence. See footnote 1.

"We begin our review of the trial court's action by noting that [a]s a general rule, evidence of prior misconduct is inadmissible to prove that a defendant is guilty of the crime of which he is accused. . . . Nor can such evidence be used to suggest that the defendant has a bad character or a propensity for criminal behavior. . . . Evidence of prior misconduct may be admitted, however, when the evidence is offered for a purpose other than to prove the defendant's bad character or criminal tendencies. . . . Exceptions to the general rule precluding the use of prior misconduct evidence have been recognized in cases in which the evidence is offered to prove, among other things, intent, identity, motive, malice or a common plan or scheme. . . .

"In order to determine whether such evidence is admissible, we use a two part test. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of [the prior misconduct] evidence must outweigh [its] prejudicial effect . . . . Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only whe[n] abuse of discretion is manifest or whe[n] an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Merriam*, 264 Conn. 617, 661, 835 A.2d 895 (2003).

Under the first prong of our analysis, we conclude that the statements admitted by the court concerning the defendant's prior drug use were relevant and mate-

rial, and, therefore, the court did not abuse its discretion in admitting the uncharged misconduct evidence. The defendant's drug use prior to, during and following the time of Darrell Ashton's murder evinced the defendant's ongoing drug problem that was highly probative of his intent and motive. It is reasonably probable that the jury inferred that the defendant was motivated by his ongoing drug use to commit the robbery or burglary, which resulted in the murder.

In accordance with the second prong of our analysis, we conclude that the court did not abuse its discretion in determining that the probative value of the evidence sufficiently outweighed its prejudicial effect. The court held a hearing on the admissibility of the uncharged prior misconduct evidence and considered each statement regarding the defendant's drug use to determine whether it would be prejudicial. "Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury." (Internal quotation marks omitted.) *State* v. *Smith*, 275 Conn. 205, 218, 881 A.2d 160 (2005). After considering the evidence, the court chose to exclude a portion of the statement concerning the defendant's discharge from the armed forces because it would be highly prejudicial. The statements that ultimately were admitted concerning the defendant's ongoing drug use were highly probative of the defendant's intent and motive to commit the robbery or burglary and resulting murder and, thus, substantially outweighed their potential for prejudice.

On the basis of our analysis, we conclude that the court did not abuse its discretion in admitting evidence of uncharged misconduct concerning the defendant's

ongoing drug use. The evidence admitted satisfies both prongs of the applicable analysis, as it was both relevant and material, and its probative value outweighed its prejudicial effect.

## II

The defendant's second claim is that the court abused its discretion by improperly admitting certain consciousness of guilt evidence concerning his use of a false name six years after Darrell Ashton was murdered.[2] We disagree.

The following facts are relevant to our resolution of that issue. In the defendant's statement made at police headquarters, he admitted using aliases, Daryl Alston and Darrell Alston subsequent to the murder. The defendant was married in 1986 and identified himself as Darrell Alston on the marriage license. The court allowed the state to enter into evidence the marriage license and the defendant's statement concerning the use of those aliases over defense counsel's objection.

[2] The following portions of the defendant's written statement that reference his use of a false name were offered into evidence: "When I decided to leave Connecticut and head south I began hitchhiking and was offered a ride at a truck stop in Delaware just on the other side of the Delaware Bridge. Prior to leaving with this man he told me that he had to make a stop at a warehouse in Maryland. I told him that this was not a problem. I can not remember what his name is. When we stopped at the warehouse I got out of the truck and went into the bathroom, where I saw a wallet lying on the bathroom sink. It was a brown bifold wallet. There was also a Discover Credit Card in the wallet that I tried to use but could not. I picked up the wallet and put it into my pocket. I did not know what was in the wallet. At some point, I opened the wallet and found that there was a Maryland driver['s] photo license identification in it that was similar to me in description. For approximately four (4) months I assumed this name, which was Daryl Alston. . . . I gave the police the name Daryl Alston, they eventually came to me and asked me what my real name was because they had been to where I was staying and found my wallet with my real identification listing me as Herbert Ross.

"During my time with Marie, we got married . . . . I married Marie under the name of Darrell Alston in Rock Hill, South Carolina."

As stated previously, "[w]e review evidentiary claims under the abuse of discretion standard." *State* v. *Browne*, 84 Conn. App. 351, 386, 854 A.2d 13, cert. denied, 271 Conn. 931, 859 A.2d 930 (2004). "A trial court may admit [e]vidence that an accused has taken some kind of evasive action to avoid detection for a crime, such as flight, concealment of evidence, or a *false statement*, [which] is ordinarily the basis for a charge on the inference of consciousness of guilt. . . . The trial court, however, should admit only that evidence where its probative value outweighs its prejudicial effect. . . . In seeking to introduce evidence of a defendant's consciousness of guilt, [i]t is relevant to show the conduct of an accused . . . *as well as any statement made by him* subsequent to an alleged criminal act, which may be inferred to have been influenced by the criminal act." (Emphasis in original; internal quotation marks omitted.) *State* v. *Riser*, 70 Conn. App. 543, 547–48, 800 A.2d 564 (2002). "[M]isstatements of an accused, which a jury could reasonably conclude were made in an attempt to avoid detection of a crime or responsibility for a crime or were influenced by the commission of the criminal act, are admissible as evidence reflecting a consciousness of guilt." (Internal quotation marks omitted.) *State* v. *Moody*, 214 Conn. 616, 626, 573 A.2d 716 (1990). "The assumption of a false name and address obviously constitutes consciousness of guilt evidence." (Internal quotation marks omitted.) *State* v. *Riser*, supra, 548.

The jury was entitled to consider the evidence concerning the defendant's use of aliases that were so similar to the name of Darrell Ashton as to create an inference of guilt. The probative value of the evidence of the defendant's use of aliases to establish consciousness of guilt far outweighed its potential for prejudice. The court, therefore, did not abuse its discretion by admitting the evidence.

## III

The defendant's final claim is that there was insufficient evidence for the state to prove the crime of felony murder. The defendant contends that the state failed to prove beyond a reasonable doubt that Darrell Ashton's murder was caused "in the course of or in furtherance" of a robbery or burglary. We disagree.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Montgomery*, 254 Conn. 694, 732, 759 A.2d 995 (2000).

"In order to obtain a conviction for felony murder the state must prove, beyond a reasonable doubt, all the elements of the statutorily designated underlying felony, and in addition, that a death was caused in the course of and in furtherance of that felony." (Internal quotation marks omitted.) *State* v. *Lewis*, 245 Conn. 779, 786, 717 A.2d 1140 (1998). General Statutes § 53a-133 provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny." A person

is guilty of burglary "when he enters or remains unlawfully in a building with intent to commit a crime therein." See General Statutes § 53a-103.

We now review whether there was sufficient evidence that Darrell Ashton's murder occurred in the course of or in furtherance of a robbery or burglary. The defendant argues that there was insufficient evidence presented to establish his intent to commit either a robbery or burglary at the time of the killing. "The requirement that the death be 'in the course of' the felony focuses on the temporal relationship between the killing and the underlying felony." *State* v. *Cooke*, 89 Conn. App. 530, 536, 874 A.2d 805, cert. denied, 275 Conn. 911, 882 A.2d 677 (2005) "[I]f the use of force occurs during the continuous sequence of events surrounding the taking or attempted taking, even though some time immediately before or after, it is considered to be in the course of the robbery or the attempted robbery within the meaning of the statute." (Internal quotation marks omitted.) *State* v. *Ghere*, 201 Conn. 289, 297, 513 A.2d 1226 (1986).

On the basis of the evidence presented and the inferences reasonably drawn therefrom, the jury reasonably could have concluded that the defendant committed the murder in the course of or in furtherance of a robbery or burglary. Darrell Ashton was last seen alive during the early morning hours of Saturday, May 10, 1980, at a Hartford club, where he was "hoping to meet someone to take home." His body was discovered the following Sunday, May 11, 1980. He was the victim of a brutal murder that included being punched in the face, manually strangled and then stabbed eleven times in his chest and back. The defendant, who had a long history of drug use, left his fingerprints on numerous objects in Darrell Ashton's home, and left a bloody palm print on a bathroom vanity near where the body was discovered. The defendant's DNA was extracted from a stain on a

crumpled sheet that was wrapped around the murder weapon. Darrell Ashton's wallet was lying on the floor where his body was discovered, and the television set and stereo equipment that he kept in his home were taken at some time either immediately preceding the murder or shortly thereafter. In the years following the murder, the defendant used various aliases that were almost identical to Darrell Ashton's name.

We are mindful that because "direct evidence of the accused's state of mind is rarely available . . . intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Internal quotation marks omitted.) *State* v. *Gary*, 273 Conn. 393, 407, 869 A.2d 1236 (2005). "Intent is a question of fact, the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one." (Internal quotation marks omitted.) *State* v. *Booth*, 250 Conn. 611, 656, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000). The jury reasonably could have inferred that the defendant had accompanied Darrell Ashton, perhaps under the guise of a romantic liaison, in order to get into his home for the purpose of committing a robbery or burglary. Once the men were inside, the encounter at some point escalated into violence, resulting in the murder.

The defendant argues that the jury's confusion regarding the felony murder charge supports his contention that the evidence was insufficient to support the conviction on that charge. We disagree with his assertion. During deliberations, the jury posed a question to the court regarding the defendant's culpability if he took the items after the murder in regard to the charge of felony murder. The court correctly responded that the murder must have been carried out in the furtherance of the burglary or robbery. As long as the

jury reasonably could infer that the defendant had the requisite intent to commit the felony, it was irrelevant whether Darrell Ashton discovered the defendant attempting to steal the missing items or the defendant took the items after the murder. Under either scenario, the jury reasonably could have found that the defendant committed the murder during a "sequence of events surrounding the taking or attempted taking" of the stereo equipment, television set and any money that may have been in Darrell Ashton's wallet during the commission of the crime. See *State* v. *Ghere*, supra, 201 Conn. 297. Alternatively, the jury reasonably could have inferred that even if the defendant had permission to enter the home, he remained unlawfully with the necessary "intent to commit a crime therein."

Viewing the evidence in a light most favorable to sustaining the verdict, we conclude that the jury reasonably could have inferred from the evidence presented at trial that the defendant committed the murder while in the course of or in furtherance of a robbery or burglary, which supports the jury's verdict of guilty on the felony murder charge.

The judgment is affirmed.

In this opinion the other judges concurred.