# STATE OF CONNECTICUT *v.* TRICIA LYNNE COCCOMO
## (AC 28819)

Bishop, Gruendel and Berdon, Js.

Argued January 15—officially released June 30, 2009

*Robert S. Bello*, with whom, on the brief, were *Patrick D. McCabe, Lawrence M. Lapine* and *Thomas M. Cassone*, for the appellant (defendant).

*Robin S. Schwartz*, assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, *Joseph C. Valdes*, assistant state's attorney, and *Dina Urso*, deputy assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Tricia Lynne Coccomo, appeals from the judgment of conviction, rendered after

a jury trial, of three counts of manslaughter in the second degree with a motor vehicle in violation of General Statutes § 53a-56b (a), three counts of misconduct with a motor vehicle in violation of General Statutes § 53a-57 and one count of operating a motor vehicle while under the influence of intoxicating liquor or drugs in violation of General Statutes § 14-227a (a) (2). On appeal, the defendant claims that (1) the trial court improperly admitted evidence of her blood alcohol content, (2) there was insufficient evidence to sustain her conviction and (3) the court improperly admitted consciousness of guilt evidence. We agree with the defendant's third claim and, accordingly, reverse the judgment of the trial court.

The following evidence was adduced at trial and is relevant to the resolution of the defendant's claims on appeal. At approximately 7 p.m. on July 26, 2005, the defendant attended a work-related dinner at a colleague's home where jambalaya and sangria were served. The hostess explained that she served two pitchers of sangria to her eight guests, each pitcher containing no more than a magnum of wine. One pitcher had white wine, the other red. Both were mixed with fruit, honey and sparkling water. There was no other alcohol served at the party. At the end of the dinner party, the pitcher of red sangria appeared untouched and the pitcher of white sangria was three-quarters consumed. The defendant testified that she drank between one and two glasses of sangria during dinner. The other guests testified that they, too, consumed some of the sangria. There was no evidence that the defendant consumed any other alcohol before or after dinner. All of the people at the dinner testified that the defendant did not display any signs of intoxication and that she seemed normal throughout the dinner party.

Sometime between 9 p.m. and 9:30 p.m., the defendant left the dinner to go home. At approximately 9:28

p.m., the defendant, who was driving northbound at approximately forty-five miles per hour, the posted speed limit, around a curve on Long Ridge Road in Stamford, collided with another vehicle traveling southbound at approximately the same speed. The defendant's vehicle was three feet over the center line of the roadway at the time of the collision. The three occupants of the other vehicle died from the injuries that they sustained as a result of the collision. The defendant sustained a broken ankle and minor lacerations.

Officer Frank Laccona of the Stamford police department was one of the first police officers on the scene. He helped the defendant out of her vehicle. Shortly thereafter, technicians from Stamford Emergency Medical Services, Inc. (emergency medical services), arrived. Robert Voss of the emergency medical services testified that the defendant was stable and ambulatory and that she was alert and oriented. Jennifer Mardi, also of the emergency medical services, testified that the defendant had the odor of alcohol on her breath. She asked the defendant if she was okay and if she had been drinking. In response, the defendant stated that she had had a few drinks. After checking the defendant's vital signs, Mardi transferred her care to paramedic Kirsten Engstrand who, along with fellow emergency medical technician, Yannick Passemart, accompanied the defendant to Stamford Hospital. Engstrand testified that although she did not write it in her report, the defendant did have the odor of alcohol on her breath. Engstrand stated that the defendant was conscious, alert, oriented and ambulatory. Passemart also testified that he detected a slight odor of alcohol on the defendant. Both Engstrand and Passemart indicated that the defendant's speech was slightly slurred, but Engstrand acknowledged that such slurring was consistent with having

just been in a serious accident and with having been upset and crying.

The defendant's blood was drawn in the ambulance on the way to the hospital. Although the emergency medical technicians' report indicates that the defendant's blood was drawn by Passemart, who was not legally qualified to do so, the testimony at trial was that her blood was drawn by Engstrand. Engstrand indicated that she had a distinct recollection of her treatment of the defendant due to the serious nature of the collision. Engstrand testified that she used five tubes to collect the defendant's blood, one 10 milliliter tube with a pink top, and four 5 milliliter tubes: one with a blue top, one green, one lavender and one yellow. Engstrand testified that she never used tubes of any other description and that she did not have access to any other tubes. After she filled the tubes, she placed them in a biohazard bag, rolled the bag up and taped it to the defendant's intravenous bag. Engstrand did not label the tubes as containing the defendant's blood, as it was not procedure to do so, nor did she label the biohazard bag.

The ambulance arrived at Stamford Hospital between 10:10 and 10:18 p.m. Engstrand indicated that upon arrival at the hospital, she placed the intravenous bag and the biohazard bag containing the tubes of the defendant's blood on or between the defendant's legs. The defendant was met at the hospital by Officer Robert Bulman of the Stamford police department, who asked her a series of questions. Bulman indicated that he had no problem understanding the defendant's responses and that her speech was not slurred. Bulman testified that in his experience, intoxicated individuals are unable to answer the questions he posed to the defendant. Bulman did, however, note an odor of alcohol on the defendant's breath.

Emergency room nurse Toren Utke assumed the defendant's care from Engstrand. Utke testified that the

defendant appeared alert and oriented, and was not confused or slurring her words and that he never smelled the odor of alcohol on her breath. He indicated that the defendant attained a perfect score on the Glasgow coma scale.[1] Utke testified that Engstrand identified a biohazard bag of blood as the defendant's and that he left the blood with the defendant while he printed labels for the tubes. Utke indicated that he individually labeled the tubes of blood, placed them back in the biohazard bag and sent them to the laboratory.

Utke and other emergency room staff testified that the emergency room was very hectic and "crazy" that night due to the trauma patients from the defendant's collision. The hospital records indicate that the blood sample attributed to the defendant was one of three blood samples collected in the emergency room at precisely 10:30 p.m.[2] The laboratory staff printed and affixed new labels to each tube, placing the new label over the old one. The laboratory director, William Wilson, explained that this procedure of labeling and then relabeling the tubes was later changed in October, 2005, due, in part, to the risk of error inherent in relabeling. Under the new system, the laboratory does not relabel the tubes. Rather, the tubes retain their original labels for their life use.

Wilson also produced documents that he referred to as an "audit trail," consisting of a series of screenshots from the laboratory's computers revealing certain information about the blood tubes tested by the laboratory. The documents indicate that the laboratory labeled and

[1] The Glasgow coma scale assesses brain function on the basis of how a patient responds to certain stimuli by opening the eyes and giving verbal and motor responses.

[2] The hospital records are inaccurate in that the defendant's blood was drawn in the ambulance, not at the hospital, and, because the defendant arrived at the hospital at 10:15 p.m., her blood had to have been drawn prior to that time.

tested blood that was collected from the defendant at 10:30 p.m. in the emergency room and deposited in a 10 milliliter "red-gray top" tube. Despite the contents of the "audit trail" documents, the evidence at trial revealed, unequivocally, that the defendant's blood was drawn in the ambulance, and not at the hospital, and that she arrived at the hospital at 10:15 p.m. The evidence is also clear that when the blood was taken from the defendant in the ambulance, none of it was deposited into a tube with a "red-gray top." The blood in the red-gray tube, which was attributed to the defendant, reportedly contained a blood alcohol content of 0.241. Those results were admitted into evidence over the defendant's objection.

Both toxicologists, Robert Powers for the state and Richard Stripp for the defendant, testified as to the probable effect a 0.241 blood alcohol content would have on an individual. Both toxicologists testified that a reading of 0.241 at 9:52 p.m. would equate to a reading of roughly 0.25 at 9:28 p.m., the time of the accident, assuming no further alcohol was ingested. Powers opined that to produce such a reading, the defendant would have had to have consumed ten or eleven servings of alcohol in one hour, and Stripp indicated that the defendant would have had to have consumed three-quarters of a pitcher of sangria to reach that level. Powers stated that such a high level of intoxication would result in cognitive impairment noticeable to others. Powers expressed that if his blood alcohol content were that high, he probably would not "be sitting up." Stripp opined that a blood alcohol content of 0.241 or 0.25 would render an average person overtly intoxicated, staggering, demonstrating motor impairment, cognitive dysfunction and slurring words, and that a blood alcohol content of 0.25 is "sloppy drunk."

James Sarnelle, the trauma surgeon who cared for the defendant, testified that he did not observe any

signs of intoxication in the defendant. He indicated that she was not slurring her words, she was alert and that she had no problems in communicating with him and that he did not detect the odor of alcohol on her breath. Sarnelle stated that if he had observed any signs of intoxication in the defendant, he would have noted them in his report. He opined that an intoxicated individual would not score a perfect fifteen on the Glasgow coma scale, which the defendant did three times that evening.

The defendant was arrested and charged with three counts of manslaughter in the second degree in violation of General Statutes § 53a-56 (a) (1), three counts of manslaughter in the second degree with a motor vehicle in violation of § 53a-56b (a), three counts of misconduct with a motor vehicle in violation of General Statutes § 53a-57 (a), one count of operating a motor vehicle while under the influence of intoxicating liquor or drugs in violation of § 14-227a (a) (2), one count of failure to keep a narcotic drug in the original container in violation of General Statutes § 21a-257 and one count of possession of less than four ounces of marijuana in violation of General Statutes § 21a-279 (c). She was convicted of three counts of manslaughter in the second degree with a motor vehicle, three counts of misconduct with a motor vehicle and one count of operating a motor vehicle while under the influence of intoxicating liquor or drugs, and was acquitted of the remaining charges. The defendant was sentenced to a total effective term of twenty years incarceration, execution suspended after twelve years, followed by five years of probation and a $1000 fine. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly admitted evidence of her blood alcohol content.

Because the defendant's claim is buttressed by an argument not made before the trial court, it is unavailable for our review.

The following additional procedural history is relevant to the defendant's claim. On January 25, 2007, the third day of the trial in this matter, the defendant filed a motion to preclude the blood alcohol content report.[3] Although the defendant sought a *Porter*[4] hearing in her motion, the motion was not a challenge to scientific methodology but, rather, a challenge to the chain of custody of her blood sample. In attacking the chain of custody, the defendant cited to the uncertainty of the identity of the individual who drew her blood, the confusion of whether the blood was drawn in the ambulance or at the hospital and at what time, and potential errors in the tube labeling system and computer problems related to emergency medical services' reports, called "run sheets." The court denied the defendant's motion, concluding that the chain of custody was "sufficient to allow the jury to consider the test results."

On appeal, the defendant contends that the chain of custody was not established because the laboratory "tested and attributed to [the defendant] a 10 milliliter red-gray topped tube of blood when the testimony and evidence unequivocally established that [her] blood was in a yellow-gold tube less than 5 milliliters." Indeed, the evidence adduced at trial does not explain this discrepancy. There was no explanation offered as to when,

---

[3] The defendant had previously filed a motion to suppress any and all of the blood evidence on the basis that it had been seized in violation of the fourth amendment due to the fact that the warrant permitted the seizure of the evidence for any blood drawn from the defendant following her admission to Stamford Hospital, and the defendant's blood was drawn in the ambulance, before she arrived at or was admitted to the hospital. The court denied the motion to suppress, and the defendant has not challenged that ruling.

[4] *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998).

how, or by whom, if at all, the defendant's blood was transferred from one of the five tubes into which it was originally deposited, into a tube with the red-gray top. Although the defendant challenged the chain of custody at trial, she made no claim, however, then regarding the discrepancy about the different colored tubes. Indeed, the evidence regarding the different colored tubes had not yet been presented when the defendant challenged the chain of custody. Later at trial, when the evidence regarding the discrepancy between the tubes was admitted, the defendant did not renew her objection on the basis of this newly evinced discrepancy, nor did she ask the court to reconsider its ruling regarding the admission of the blood alcohol content report. In short, the defendant did not, at any time before the trial court, challenge the admission of the report on the ground of a discrepancy in the color of the caps of the tubes purportedly containing her blood.

Our Supreme Court has stated: "[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted. . . .

"These requirements are not simply formalities. They serve to alert the trial court to potential error while there is still time for the court to act. . . . Assigning error to a court's evidentiary rulings on the basis of objections never raised at trial unfairly subjects the

court and the opposing party to trial by ambush." (Internal quotation marks omitted.) *State* v. *Simpson*, 286 Conn. 634, 645, 945 A.2d 449 (2008).

Because the defendant's present claim regarding the discrepancy in the color of the test tube caps was not raised at trial, it is not available for review on appeal. Because the chain of custody claims made at trial before the discovery of the discrepancy in tube cap colors have not been asserted on appeal, they are similarly unavailable for our review.[5]

II

The defendant next claims that there was insufficient evidence to sustain her conviction. The defendant's sufficiency claims are largely dependent on her claim that the blood alcohol content report was admitted into evidence improperly, which we have already addressed.[6] Because the blood alcohol content report was admitted into evidence and the jury was entitled to consider it, the defendant's sufficiency claims must fail.

---

[5] The dissent suggests that this court should conclude that the admission of the blood alcohol content results constituted plain error. The defendant, however, has not sought plain error review. See Practice Book § 60-5. As we repeatedly have stated, "Connecticut law is clear that a party seeking review of unpreserved claims under either the plain error doctrine . . . or *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), must affirmatively request such review." (Citation omitted.) *State* v. *Wheatland*, 93 Conn. App. 232, 243–44, 888 A.2d 1098, cert. denied, 277 Conn. 919, 895 A.2d 793 (2006); see also *Johnson* v. *Commissioner of Correction*, 288 Conn. 53, 60, 951 A.2d 520 (2008); *State* v. *Ramos*, 261 Conn. 156, 171, 801 A.2d 788 (2002).

[6] The defendant claims that even if the blood alcohol content report was admitted properly, the evidence was still insufficient because the state failed to prove that the blood tested belonged to her. We construe this argument as merely a reformulation of the evidentiary claim she failed to preserve, as set forth in part I. In other words, this argument is essentially the same as the defendant's chain of custody argument, but cast in the light of a sufficiency claim to avoid the consequences of not having preserved it at trial. Because the blood alcohol content report was admitted as evidence, it was available for the jury's consideration.

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Na'im B.*, 288 Conn. 290, 295–96, 952 A.2d 755 (2008). "This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Ali*, 92 Conn. App. 427, 437, 886 A.2d 449 (2005), cert. denied, 277 Conn. 909, 894 A.2d 990 (2006). "[T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether it believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Batista*, 101 Conn. App. 623, 626, 922 A.2d 1116, cert. denied, 284 Conn. 918, 933 A.2d 721 (2007).

"[F]or the purposes of sufficiency review . . . we review the sufficiency of the evidence as the case was tried; in other words, we review the evidence in its improperly restricted state, impropriety notwithstanding. Claims of evidentiary insufficiency in criminal cases are always addressed independently of claims of evidentiary error. . . . [A] claim of insufficiency of the evidence must be tested by reviewing no less than, and no more than, the evidence introduced at trial." (Citations omitted; internal quotation marks omitted.) *State* v.

*Smith,* 73 Conn. App. 173, 179–80, 807 A.2d 500, cert. denied, 262 Conn. 923, 812 A.2d 865 (2002).

We do not disagree with the defendant that the blood alcohol content results were a linchpin in the state's case. Those results, however, were before the jury for its consideration. Although there was testimony from many witnesses that the defendant did not appear intoxicated, that she was alert and oriented, and did not have enough to drink to substantiate a blood alcohol content of 0.241, the jury was free to weigh all of the evidence presented, including the blood alcohol content results. The jury was entitled to credit the blood alcohol content report as evidence of the defendant's intoxication despite the strong evidence suggesting a disconnect between the blood alcohol content results and the defendant's behavior during the night in question. Accordingly, there was evidence in the record from which the jury reasonably could have concluded as it did.

### III

The defendant finally claims that the court improperly admitted evidence concerning her request at the hospital for her blood alcohol content test results and evidence concerning her transfer of real property because that evidence was irrelevant to consciousness of guilt and was unduly prejudicial. We agree.

At trial, the state offered three documents on the basis that, taken together, they reflected the defendant's consciousness of guilt. The first document was an excerpt from the defendant's medical records documenting the fact that a printout of her blood alcohol content test results was given to her, at her request, on July 29, 2005, prior to her discharge from the hospital. The second document was a certified copy of a quitclaim deed that revealed that the defendant transferred her ownership interest in her Stamford home to her

mother on August 5, 2005, approximately one week after her discharge from the hospital, for "$1.00 . . . and other value being less than $100.00." The final document was a certified copy of a city of Stamford tax card, describing the property that the defendant had transferred to her mother and ascribing to it an appraised value of more than $500,000. In support of its offer of these documents, the state argued that the defendant's request for a copy of her blood alcohol content results could be deemed an "implied admission" and was relevant as consciousness of guilt. The state further contended that the quitclaim deed and the tax card showed that the defendant had transferred her interest in her home to her mother in bad faith for a price far below its value because she knew that she was guilty of driving while intoxicated and consequently killing three people. The defendant objected to the evidence as irrelevant and prejudicial. The court admitted the documents with the limitation that the defendant's request for her blood alcohol content results could be used only as "evidence on the question of the defendant's knowledge" of her blood alcohol content and how, if at all, her knowledge related to the property transfer.[7]

We review evidentiary claims under the abuse of discretion standard. "Unless an evidentiary ruling involves a clear misconception of the law, [t]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . [The

---

[7] The court ruled that "the state will not be permitted to argue to the jury . . . that simply asking for the laboratory results . . . is consciousness of guilt because I think that argument strays into a question of speculation." The court did, however, allow the state to argue that the defendant's knowledge of her blood alcohol content results, as a result of her request for them, may have influenced the transfer of her assets, thereby evincing a consciousness of guilt.

reviewing court] will make every reasonable presumption in favor of upholding the trial court's ruling . . . ." (Internal quotation marks omitted.) *State* v. *Smith*, 275 Conn. 205, 219, 881 A.2d 160 (2005).

"Section 4-3 of the Connecticut Code of Evidence provides that [r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . In a criminal trial, it is relevant to show the conduct of an accused, as well as any statement made by him subsequent to the alleged criminal act, which may fairly be inferred to have been influenced by the criminal act. . . . The state of mind which is characterized as guilty consciousness or consciousness of guilt is strong evidence that the person is indeed guilty . . . and, under proper safeguards . . . is admissible evidence against an accused." (Citations omitted; internal quotation marks omitted.) *State* v. *Camacho*, 92 Conn. App. 271, 294, 884 A.2d 1038 (2005), cert. denied, 276 Conn. 935, 891 A.2d 1 (2006).

"Our Supreme Court has . . . made clear that . . . consciousness of guilt [evidence] goes to the question of the defendant's state of mind, a determination which in turn requires an assessment of the defendant's motivations . . . ." (Internal quotation marks omitted.) *State* v. *Davis*, 98 Conn. App. 608, 628, 911 A.2d 753 (2006), aff'd, 286 Conn. 17, 942 A.2d 373 (2008). "A trial court may admit [e]vidence that an accused has taken some kind of evasive action to avoid detection for a crime, such as flight, concealment of evidence, or a false statement, [which] is ordinarily the basis for a

charge on the inference of consciousness of guilt. . . . The trial court, however, should admit only that evidence where its probative value outweighs its prejudicial effect." (Internal quotation marks omitted.) *State v. Riser*, 70 Conn. App. 543, 547–48, 800 A.2d 564 (2002). "[M]isstatements of an accused, which a jury could reasonably conclude were made in an attempt to avoid detection of a crime or responsibility for a crime or were influenced by the commission of the criminal act, are admissible as evidence reflecting a consciousness of guilt." (Internal quotation marks omitted.) *State v. Moody*, 214 Conn. 616, 626, 573 A.2d 716 (1990); see also *State v. Riser*, supra, 548 (assumption of false name and address constitutes consciousness of guilt evidence).

In admitting the consciousness of guilt evidence in this case, the court relied heavily on *Batick v. Seymour*, 186 Conn. 632, 443 A.2d 471 (1982). In *Batick*, the defendant conveyed his interest in real property to his wife, for "love and affection," less than three months after he was involved in a motor vehicle collision. Id., 637. The defendant was aware that the other party involved was paralyzed as a result of the collision and indicated that his automobile insurance policy was limited to $25,000 and that he had consulted an attorney about the transfer. The plaintiff sought to introduce evidence of the property transfer to establish the defendant's consciousness of liability. Our Supreme Court concluded that the trial court should have admitted the evidence, stating: "Under these circumstances we are not persuaded that the likelihood of prejudice was so great as to warrant a deviation from the general rule admitting evidence of post-accident transfers to show that the defendant did not view his position in the possible forthcoming litigation as entirely impregnable. The evidence was neither so remote nor so prejudicial that

its significance upon the issues of the case could not be entrusted to the jury." Id., 638.

*Batick*, however, was a civil case involving potential civil liability. The state has not offered, and we have not found, any decisional law in support of its contention that a transfer of assets after an automobile accident is probative of consciousness of guilt of the commission of a crime. The mere fact that one may be subject to suit in a civil matter premised on negligence does not necessarily evince a consciousness of criminal culpability. We find the present case more analogous to *United States* v. *Ferguson*, United States District Court, Docket No. 3:06CR137 (CFD), 2007 U.S. Dist. LEXIS 87842 (D. Conn. November 30, 2007). In *Ferguson*, the defendant was facing both criminal charges and civil litigation as a result of fraudulent filings with the Securities and Exchange Commission. In the criminal matter, the government sought to introduce evidence of the defendant's property transfers as consciousness of guilt. The court concluded that although the evidence of the defendant's property transfers may have been probative of his state of mind at the time, the speculation surrounding the motivation of the transfers rendered the evidence more prejudicial than probative. Id., *11–12.

Here, the defendant explained that she transferred the interest in her home to her mother because, throughout her marriage, her husband had borrowed approximately $250,000 from her mother and that because she was planning to divorce her husband, she was transferring this asset in an attempt to ensure that her mother would get her money back. The defendant testified that she had started to prepare the paperwork for the transfer of her assets two weeks prior to the accident. Although the defendant's act of transferring her interest in her home could have been viewed as an attempt to protect that asset in the case of civil litigation arising

from the collision, as in *Ferguson,* the motivation for the transfer was speculative.

The evidence admitted was likely to lead the jury to believe that the defendant transferred her property in an attempt to evade any responsibility she may have had in the accident. Because there were three fatalities resulting from the collision in this case, evidence of such an effort by the defendant to protect her assets was likely to inflame the jury and distract it from the issues at hand. On this basis, we conclude that the consciousness of guilt evidence was more prejudicial than probative and, therefore, was admitted improperly.

"When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict. . . . [O]ur determination that the defendant was harmed by the trial court's [evidentiary rulings] is guided by the various factors that we have articulated as relevant [to] the inquiry of evidentiary harmlessness . . . such as the importance of the [evidence] in the prosecution's case, whether the [evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [evidence] on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Thomas,* 110 Conn. App. 708, 718–19, 955 A.2d 1222, cert. denied, 289 Conn. 952, 961 A.2d 418 (2008).

Here, the state's case was not very strong and relied almost entirely on the admission of a blood alcohol content report. The level of intoxication implied by this

report was in stark contrast with the anecdotal evidence of the defendant's behavior during the dinner party, at the accident scene and at the hospital, and with forensic evidence of the likely effects such a reading would have on an individual's bearing and behavior. The fact that the defendant sought her blood alcohol content results from the hospital and transferred real estate to her mother without consideration was not crucial to the state's case, nor was it cumulative of any other evidence of the defendant's state of mind or consciousness of guilt. Because this was a close case in which the evidence of intoxication rested heavily on questionable blood alcohol content results that were at variance with much of the testimonial evidence, the admission of the prejudicial evidence of the defendant's transfer of assets likely tipped the scale in favor of the state. Accordingly, we cannot be assured that the admission of this evidence did not substantially affect the verdict. On this basis, we conclude that the admission of the evidence was both improper and harmful.

The judgment is reversed and the case is remanded for a new trial.

In this opinion GRUENDEL, J., concurred.

BERDON, J., concurring in part and dissenting in part. I agree with part III of the majority opinion that the trial court improperly admitted the alleged consciousness of guilt evidence. The request at the hospital by the defendant, Tricia Lynne Coccomo, for the results of her blood alcohol content test and evidence concerning her transfer of real property subsequent to the automobile collision at issue should not have been admitted into evidence because, under the circumstances of this case, that evidence was irrelevant and unduly prejudicial.

I write separately because in my opinion there is insufficient evidence and indeed no admissible evidence to sustain a conviction under General Statutes

§§ 14-227a (a) (2), 53a-56b (a) and 53a-57, all of which were predicated on the claim that the defendant had a blood alcohol content of 0.241. It is absolutely clear that the blood tested was not that of the defendant and that the only evidence that she was intoxicated was the tested blood sample.[1] A blood alcohol content of 0.241 is a level of alcohol intoxication equivalent to a "fall down drunk," or, as described by Robert Powers, the state's toxicologist, as "sloppy drunk." The evidence of consumption of alcohol by the defendant was insufficient to support a conviction of driving under the influence of alcohol.

The majority refuses to reverse the conviction on this ground because the trial attorney representing the defendant challenged the admission of the blood samples only on the ground of the chain of custody and not because of the discrepancy that the blood collected from the defendant was in a test tube completely different from that of the blood tested, which produced a blood alcohol content of 0.241. "The state's burden with respect to chain of custody is met by showing that there is a reasonable probability that the substance has not been changed in important respects." (Internal quotation marks omitted.) *State* v. *Estrada*, 71 Conn. App. 344, 353, 802 A.2d 873, cert. denied, 261 Conn. 934, 806 A.2d 1068 (2002). In this case, I would conclude that the defendant's chain of custody objection preserved her argument that her blood was not the blood that was tested. Furthermore, the court's failure to exclude blood evidence that clearly was not the defendant's blood constituted plain error within the meaning of Practice Book § 60-5, which provides in relevant part that a reviewing court "may *in the interests of justice* notice plain error not brought to the attention of the

---

[1] See the majority opinion for the testimony of witnesses, both lay and professional, with respect to the defendant's appearance with respect to her sobriety.

trial court. . . ." (Emphasis added.) See *State* v. *Preyer*, 198 Conn. 190, 199, 502 A.2d 858 (1985) (reversing conviction on basis of nonpreserved error because "interest of justice" required it).[2]

Although we reverse the judgment on the grounds of the inadmissibility of evidence, which was irrelevant to consciousness of guilt, a reversal also based on the erroneous admissibility of the blood alcohol content tests would put to rest the possibility of a retrial of this second grade schoolteacher who has unjustly lived with this nightmare for more than five years.

Accordingly, I respectfully concur in part and dissent in part.

---

[2] The majority correctly points out that the plain error doctrine was not raised by the defendant in her brief before this court. The doctrine, however, was unwittingly raised by the state when it argued in its brief before this court the following: "Reversal under plain error is equally unwarranted. Where the defendant, herself, did not even argue to the jury during her closing argument that the evidentiary discrepancy arising from the test tube evidence raised a reasonable doubt about the reliability of the blood alcohol content results, it can hardly be argued that the error was so obvious, clear and harmful as to warrant a reversal of her conviction."