******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# TRICIA COCCOMO *v.* COMMISSIONER OF CORRECTION
## (AC 42933)

Alvord, Prescott and Moll, Js.

*Syllabus*

The petitioner, who had been convicted of manslaughter in the second degree with a motor vehicle, misconduct with a motor vehicle and operating a motor vehicle while under the influence of intoxicating liquor or drugs, sought a writ of habeas corpus, claiming that her trial counsel rendered ineffective assistance. The petitioner contended that she was prejudiced by counsel's responses to evidence of her blood alcohol content and consciousness of guilt in connection with a motor vehicle collision that killed the occupants of a vehicle that was struck by the petitioner's vehicle. The petitioner had consumed alcohol at a party prior to the accident. A paramedic at the accident scene drew and labeled five tubes of the petitioner's blood, which were placed in a biohazard bag and taken with the petitioner in an ambulance to a hospital. Each of the tubes had a different colored cap. A computer in the hospital's laboratory scanned the tubes and printed labels that identified the test to be performed on each tube of blood. After a hearing outside the jury's presence, the trial court denied the petitioner's motion to exclude the blood alcohol content evidence. W, a laboratory director at the hospital, then testified that a printout from the laboratory's computer had indicated that the type of tube normally used to test blood alcohol content had a cap that was different in color from the caps on the five tubes that were in the biohazard bag. The petitioner's counsel thereafter did not renew his motion to exclude the blood alcohol content evidence on chain of custody grounds. The state also offered consciousness of guilt evidence that, shortly after the accident, the petitioner had executed a quitclaim deed transferring her one-half interest in her home to her mother. Defense counsel objected unsuccessfully to the admission of that evidence on the ground that, although evidence of a transfer of property to shield assets from recovery may be admissible in a civil case as probative of liability, it was not admissible to establish consciousness of guilt in a criminal case, and that the prejudicial effect of the evidence outweighed its probative value. *Held*:

1. The petitioner could not prevail on her claim that trial counsel rendered deficient performance when he did not renew his motion to exclude the blood alcohol content evidence after W's testimony or discuss it during closing argument to the jury:

   a. There was no reasonable probability that the trial court would have excluded the blood alcohol evidence if counsel had renewed his objection or that a reviewing court would have concluded that the trial court abused its discretion in overruling such an objection: counsel's more than sufficient, reasonable explanation for the discrepancy between the color of the tube cap in the hospital's records and the color of the cap on the tube into which the paramedic drew the petitioner's blood did not undermine the chain of custody evidence so as to require the exclusion of the test results, as the evidence tended to demonstrate that the hospital and the ambulance service used tubes with different colored caps relative to blood alcohol testing, the tubes the ambulance service used were a smaller, acceptable version of the tubes the hospital used, and, as it was unclear whether the hospital's computer system had an option in a drop-down menu to describe the color of the tube that contained the blood sample being tested, it was likely that the technician inputting the data selected the option that showed the type of tube used by the hospital, despite its not having been the precise color of the cap on the actual blood tube from which the sample tested was drawn; moreover, the state elicited substantial testimony tracing the chain of custody of the petitioner's blood samples, no witness from the laboratory testified as to any confusion, problems or mix-ups in processing the laboratory's work at the time the blood test was conducted, and the only other blood sample that was tested that night, which was from

another patient, showed no detectable alcohol, a result that made it highly unlikely that it came from the petitioner in light of her admissions and other evidence that she drank a significant amount of alcohol before the accident.

b. The habeas court properly concluded that the petitioner failed to establish that her counsel rendered deficient performance by failing to emphasize during closing argument W's testimony regarding the discrepancy in the color of the test tube caps: the petitioner did not demonstrate that there was a reasonable probability that the outcome of the trial would have been different had counsel emphasized W's testimony, as counsel gave a well reasoned, detailed closing argument in which he attempted to undermine the reliability of the blood alcohol test result by focusing on discrepancies in the collection, labeling and testing of the petitioner's blood, he highlighted the testimony of the medical professionals and witnesses who had attended the party that she did not exhibit behavior there that was consistent with intoxication, and, had counsel emphasized W's testimony, the state could have responded by focusing on facts that provided a reasonable explanation for the discrepancy; moreover, as there was strong evidence of the petitioner's guilt, which included her statement to a paramedic at the accident scene that she had been drinking at the party, the petitioner failed to establish that she was prejudiced by her counsel's failure during closing argument to emphasize W's testimony.

2. The habeas court properly concluded that the petitioner was not prejudiced by her counsel's performance with respect to consciousness of guilt evidence concerning the transfer of her interest in her home to her mother shortly after the accident:

a. Testimony from witnesses that counsel decided not to call, who would have corroborated the petitioner's explanation that she was planning to divorce her husband and wanted to protect her mother's finances from him, was not reasonably likely to have resulted in the exclusion of the property transfer evidence or changed the outcome of the trial, as the petitioner did not initiate divorce proceedings until fourteen months after the accident, which placed in issue her motivation for the transfer so soon after the accident, and, as the evidence of the property transfer itself was mundane, it was unlikely that the jury gave significant credence to the state's contention that it evidenced a guilty conscience.

b. The petitioner failed to prove that her counsel undermined her innocent explanation for the property transfer when he elicited from her testimony that her interest in the property was transferred back to her because the initial transfer to her mother was inappropriate; it was unlikely that the trial was impacted by that single response from the petitioner, given the collateral relationship of the property deed when viewed against the substantial direct evidence against her, as the trial court sustained the state's objection to her testimony and, in its charge to the jury, instructed that the jury was not to consider testimony that had been stricken, which it must be presumed the jury followed in the absence of evidence to the contrary.

Argued October 21, 2020—officially released April 6, 2021

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Newson, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Damian K. Gunningsmith*, assigned counsel, with whom was *Drew Cunningham*, assigned counsel, for the appellant (petitioner).

*Melissa L. Streeto*, senior assistant state's attorney, with whom, on the brief, were *Richard J. Colangelo, Jr.*, chief state's attorney, and *Joseph C. Valdes* and *Brenda L. Hans*, senior assistant state's attorneys, for the appellee (respondent).

*Opinion*

PRESCOTT, J. This habeas corpus action arises out of the conviction of the petitioner, Tricia Coccomo, of multiple offenses related to a drunken driving accident in which she caused the death of three individuals. She appeals from the judgment of the habeas court denying her petition for a writ of habeas corpus. On appeal, the petitioner claims that the habeas court improperly concluded that her trial counsel had not rendered constitutionally ineffective assistance in the manner in which he responded to evidence of the petitioner's (1) blood alcohol content and (2) consciousness of guilt. We affirm the judgment of the habeas court.

The following facts, as set forth by our Supreme Court on the petitioner's direct appeal, are relevant to the claims on appeal. "On the evening of July 26, 2005, the [petitioner] attended a dinner party hosted by Louise Orgera at her home on Dannell Drive in the city of Stamford. Orgera had prepared two pitchers of sangria, each containing a 'double bottle' of wine, to which the party guests helped themselves. Between the time that the [petitioner] arrived at the party shortly after 7 p.m. and the time that she left at approximately 9 p.m., she consumed approximately one and three quarters cups of sangria.

"After leaving the party, the [petitioner] was driving northbound on Long Ridge Road at approximately 9:30 p.m. when her vehicle crossed the center line and collided with a southbound vehicle occupied by James Inverno, Barbara Inverno and Glenn Shelley. The estimated combined speed of the impact was ninety miles per hour, and both vehicles sustained severe damage. All three occupants in the other vehicle died as a result of the injuries that they incurred in the collision. The [petitioner] suffered broken bones in her left foot and lacerations, and was transported to Stamford Hospital (hospital), where a blood test revealed that she had a blood alcohol content of 241 milligrams per deciliter or 0.241 percent. It was estimated that the [petitioner's] blood alcohol content at the time of the collision was approximately 250 milligrams per deciliter or 0.25 percent." *State* v. *Coccomo*, 302 Conn. 664, 666–67, 31 A.3d 1012 (2011).

The petitioner was charged with numerous offenses and was convicted, following a jury trial, of three counts of manslaughter in the second degree with a motor vehicle in violation of General Statutes § 53a-56b (a), three counts of misconduct with a motor vehicle in violation of General Statutes § 53a-57 (a), and one count of operating a motor vehicle while under the influence of intoxicating liquor or drugs in violation of General Statutes § 14-227a (a) (2). Id., 667.[1] On direct appeal, this court declined to review the petitioner's unpreserved claim that the trial court improperly had admitted evi-

dence of her blood alcohol content in light of a discrepancy in the evidence regarding the color of the test tube cap on the vial containing a sample of her blood. *State* v. *Coccomo*, 115 Conn. App. 384, 394, 396, 972 A.2d 757 (2009). This court reversed the petitioner's conviction, however, concluding that the trial court improperly had admitted consciousness of guilt evidence. Id., 386. Following the granting of the state's petition for certification to appeal, our Supreme Court reversed the decision of this court and affirmed the petitioner's conviction. *State* v. *Coccomo*, supra, 302 Conn. 666.

On September 26, 2016, the petitioner filed a petition for a writ of habeas corpus alleging ineffective assistance of her trial counsel, Michael Sherman. Count one of the petition alleged various ways in which Sherman was ineffective in responding to the evidence of the petitioner's blood alcohol content. Count two of the petition alleged various ways that Sherman was ineffective in response to consciousness of guilt evidence offered by the state that, shortly after the accident, the petitioner had executed a quitclaim deed transferring her interest in her home to her mother.

Following a habeas trial on July 5 and 6, 2018, the habeas court, *Newson, J.*, issued a memorandum of decision denying the petition. The habeas court thereafter granted the petitioner certification to appeal to this court. The petitioner then filed the present appeal, claiming that the habeas court improperly concluded that Sherman had not rendered ineffective assistance of counsel with regard to both evidence of her blood alcohol content and her consciousness of guilt evidence. Additional facts will be set forth as necessary.

Before addressing the petitioner's specific claims on appeal, we first set forth the applicable law governing a claim of ineffective assistance of counsel and our appellate standard of review. "It is well established that [a] criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings . . . . This right arises under the sixth and fourteenth amendments to the United States [c]onstitution and article first, § 8, of the Connecticut constitution. . . . As enunciated in *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)], this court has stated: It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . . A claim of ineffective assistance of counsel consists of two components: [A] performance prong and a prejudice prong. To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . To satisfy the second prong of *Strickland*, that his counsel's deficient performance prejudiced his defense, the petitioner must establish

that, as a result of his trial counsel's deficient performance, there remains a probability sufficient to undermine confidence in the verdict that resulted in his appeal. . . . The second prong is thus satisfied if the petitioner can demonstrate that there is a reasonable probability that, but for [his counsel's] ineffectiveness, the outcome would have been different. . . . An ineffective assistance of counsel claim will succeed only if both prongs [of *Strickland*] are satisfied. . . . The court, however, may decide against a petitioner on either prong, whichever is easier." (Internal quotation marks omitted.) *Francis* v. *Commissioner of Correction*, 182 Conn. App. 647, 651–52, 190 A.3d 985, cert. denied, 330 Conn. 903, 191 A.3d 1002 (2018).

"The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed [on appeal] unless they are clearly erroneous. . . . Thus, the [habeas] court's factual findings are entitled to great weight. . . . Furthermore, a finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Citation omitted; internal quotation marks omitted.) *Rogers* v. *Commissioner of Correction*, 194 Conn. App. 339, 346–47, 221 A.3d 81 (2019).

I

The petitioner asserts two related claims regarding the blood alcohol content evidence admitted at trial. First, she claims that the habeas court improperly concluded that she failed to demonstrate that she was prejudiced by Sherman's failure to object, on chain of custody grounds, to evidence of her blood alcohol content following testimony from a hospital employee regarding a discrepancy between the color of the test tube used to draw the petitioner's blood and the color of the test tube listed in the hospital's computer records.[2] The petitioner further claims that the habeas court improperly concluded that she failed to demonstrate that Sherman engaged in deficient performance by failing to argue the chain of custody issue in closing argument, and that, even if his performance was deficient, the petitioner suffered no prejudice. We disagree with both of the petitioner's assertions.

The following testimony, as summarized by our Supreme Court on direct appeal, was elicited at trial and is relevant to the disposition of the petitioner's claim. "[Paramedic Kirsten] Engstrand testified that she drew five tubes of the [petitioner's] blood, each with a different colored cap, namely, gold, green, pink, purple and blue, placed the tubes in a biohazard bag, rolled

the bag up, and taped it to the [petitioner's] intravenous fluid bag, all before the ambulance arrived at the hospital. Although Engstrand did not label the blood tubes or the biohazard bag, she stated that, upon arriving at the hospital, she placed the intravenous fluid bag and the biohazard bag containing the tubes on or between the [petitioner's] legs. She then turned the [petitioner's] care over to [Toren] Utke, the [hospital] nurse who met Engstrand and the [petitioner] when the ambulance arrived at the hospital.

"Utke testified that Engstrand identified the biohazard bag as belonging to the [petitioner] and that he left the bag with the [petitioner] while he went to obtain the printed labels produced for each patient during the hospital registration process. At that time, Shelley, the only other patient in the trauma room, was approximately twenty-five feet away from the [petitioner] and was separated from the [petitioner] by several curtains. Utke stated that he knew the blood in the biohazard bag was the [petitioner's] blood because Engstrand had informed him that it was, the bag was taped to the [petitioner's] intravenous fluid bag and each emergency medical team dealt with only one person at a time. Utke stated that, after he obtained the sheet of printed labels containing information identifying the [petitioner], he affixed a label to each tube of blood, initialed the labels, returned the tubes and a requisition sheet listing the tests to be performed to the biohazard bag, placed the bag in a special canister for transport to the laboratory and sent the canister to the laboratory through the hospital's pneumatic tube system. Utke also testified that the labels contained bar codes and that all of the other documentation pertaining to the [petitioner] contained printed labels from the same label sheet.

"No witness recalled testing the [petitioner's] blood after it arrived at the laboratory, but William H. Wilson, the administrative director of the laboratory, testified as to the procedures that were typically followed at the time in question. Wilson explained that the technician receiving the canister would take the biohazard bag out of the canister, open it, compare the name on the blood tube labels with the name on the requisition sheet to make sure they matched and then order the requested tests through the laboratory computer system by identifying the name of the patient and the tests to be performed. If a label indicated the time that the blood was drawn, the technician would enter that time into the system, but, if no time was indicated, the computer would default to the time that the information was entered into the system. Similarly, if the label contained the initials of the person who had drawn the blood, that person's initials would be entered into the system. Following entry of this information, the computer would scan the tests to be performed and print out a new label for each tube containing the patient's name, a laboratory identification number, a new bar code and

the tests to be performed on the blood in that tube. The technician would then compare the name on the new laboratory label and the name on the label affixed to each tube by the emergency department staff to determine that the names matched before placing the new bar coded and numbered laboratory label over the previous label. At that point, the technician would centrifuge the bar coded tubes, if necessary, before setting them on a rack between the processing and testing areas. Once inside the testing area, the tubes would be placed in the testing machine, which would read the bar code on each tube and perform the requested tests. In short, once the new bar coded label was placed on the tube and the tube was accepted for testing, there would be no human intervention, and the machine would mechanically read the label, conduct the tests and produce a report containing the test results. At the conclusion of this process, the technician would take the printout, check the computer screen to make sure the printout matched the information on the screen and verify and release the results, which would be communicated back to the emergency department.

"With respect to the testing of the [petitioner's] blood, Wilson testified that, after checking the records for the night of the collision, it appeared that the blood from the [petitioner] and three other patients had been tested around the same time. Neither Wilson nor [Mariela] Borrero, the laboratory technician who processed the requisition, recalled any problems or mix-ups that night. *In responding to a question as to whether any of the five tubes used to draw the [petitioner's] blood was the type of tube normally used for testing blood alcohol content, Wilson testified that '[t]he [type of] tube that was indicated in the computer is not in that bag.'[3] In other words, the computer printout indicated that the tube used to test the [petitioner's] blood alcohol content had a red and gray cap, but none of the five tubes in the [petitioner's] biohazard bag had a red and gray cap.* Wilson further explained, however, that, although a tube with a red and gray cap normally was used for testing blood alcohol content because it contained a gel that separates serum from red blood cells, a smaller tube with a gold cap, like one of the tubes in the [petitioner's] biohazard bag, contained the same gel and also could be used to test a person's blood alcohol content. In addition, Wilson explained that the computer printout describing each patient's test results contained a check mark indicating that the technician on duty had compared the printed report and the patient information with the computer results for accuracy." (Emphasis added; footnote added.) *State* v. *Coccomo*, supra, 302 Conn. 691–94.[4]

The following procedural history is also relevant to the disposition of this claim. On January 26, 2007, after the trial had started, the court held a hearing, outside the presence of the jury, on the petitioner's motion

challenging the admissibility of the blood alcohol content evidence.[5] At this hearing, Wilson testified generally "about hospital and laboratory protocols relating to the collection, processing, and laboratory testing of blood samples, as well as the workings of some of the relevant machinery." Although the petitioner challenged the admissibility of the blood alcohol content evidence at this hearing, she did not assert a challenge on the basis of any discrepancy in the color of the test tube cap containing the sample of her blood because no such testimony had yet been elicited. Following the hearing, the trial court admitted the evidence of the petitioner's blood alcohol content, concluding that the chain of custody was sufficient to allow the jury to consider the test results.[6] Accordingly, the blood alcohol content test results were admitted into evidence that day through the testimony of James Sarnelle, the trauma surgeon on call on July 26, 2005. Wilson's later testimony regarding the color of the test tube cap, which was described in the records, took place in front of the jury on January 30, 2007. After Wilson testified in front of the jury that the "[t]he [type of] tube that was indicated in the computer is not in that bag," Sherman did not renew his prior objection to the admission of the blood alcohol content evidence.

In concluding that the trial court's admission of the blood alcohol content evidence did not constitute plain error,[7] our Supreme Court stated that "the testimony indicates that the procedures used in collecting, labeling and testing the [petitioner's] blood were straightforward and apparently free of errors and that, even though the administrative director of the laboratory and the technician who processed the requisition for the tests could not specifically recall testing the [petitioner's] blood, their testimony regarding the course of conduct and their inability to recall or identify any errors in the testing procedures at the time the blood was tested supports the conclusion that there was no break in the chain of custody.

"To the extent the . . . [petitioner claims] that the inconsistent evidence regarding the color of the blood tube caps indicates that the [petitioner's] blood alcohol test results could have been obtained from a sample of someone else's blood, we reiterate that the discrepancy arises solely from a single computer record and that Wilson merely testified that the tube identified in the computer printout as containing the [petitioner's] blood did not resemble any of the tubes in the biohazard bag." *State* v. *Coccomo*, supra, 302 Conn. 694–95.

In her habeas petition, the petitioner alleged, inter alia, that Sherman provided ineffective assistance of counsel by failing to renew the motion to exclude the blood alcohol content evidence in light of Wilson's testimony regarding the different colored tube cap. At the habeas trial, Sherman was asked about the discrepancy

regarding the color of the test tube cap. In response, he indicated that Wilson's testimony was confusing and that he did not think it would be helpful for him to follow up regarding the discrepancy because of the technical nature of the testimony. Instead, Sherman focused on other aspects of the case. When asked about the fact that the "audit trail" of the testing performed on the petitioner's blood reflected that the blood sample came from a tube with a "red/gray" top, Sherman testified that it was his understanding that the description of the tube tested came from a computer screen drop-down menu that had limited choices.

In its decision, the habeas court focused on the issue created by Wilson's testimony in front of the jury that "[t]he tube that was indicated in the computer is not in that bag." The habeas court noted that this "subject . . . had not necessarily been addressed by Wilson during his testimony outside the presence of the jury." In considering the petitioner's claim, the habeas court noted Wilson's trial testimony that the tube that was used for blood alcohol testing, which "was not in that bag," was a red-gray speckled topped tube called a "tiger top" and that the "audit trail" of the blood alcohol testing performed on the petitioner indicated that the tube tested for the petitioner's blood had a "red/gray" top. As also noted by the habeas court, however, almost immediately after Wilson's statement regarding the "tiger top" tube not being in the bag, he testified that the gold topped tube in the Stamford Emergency Medical Services (EMS) array was an appropriate substitute for the standard tiger top tube; it was just a smaller version. Furthermore, as the habeas court pointed out, it was undisputed that EMS did not carry "tiger top" tubes in their vehicles.

In its decision, the habeas court rejected the petitioner's claim because she failed to demonstrate prejudice as a result of Sherman's allegedly deficient performance. The court stated that, although "Wilson's statement provided obvious fodder for cross-examination, given the substantial direct evidence from the witnesses who actually handled the petitioner's blood, and the unrefuted testimony they provided about quality controls protocols they observed, there is no reasonable basis in law, or fact, upon which this evidence could have, or should have, been kept from the jury by the trial judge. . . . The petitioner's intoxication level was directly relevant to the operating under the influence charge, and consumption of alcohol was also relevant to the manslaughter charges. Therefore, evidence supporting or refuting intoxication was presumably admissible. . . . Further, all of the witnesses who testified to the direct handling of the petitioner's blood—paramedic Engstrand, nurse Utke, and lab technician Borrero—if believed, established an unbroken chain of custody from the drawing of the petitioner's blood to the reporting of the lab results. So, while the petitioner

can legitimately argue that . . . Wilson's statement, if accepted for the meaning she advocates, conflicts with chain of custody evidence offered by other witnesses, there is no reasonable probability that the trial judge would have excluded the blood evidence, even had defense counsel specifically emphasized Wilson's lone statement." (Citations omitted; footnote omitted.) The habeas court concluded by stating that, "[i]n sum, given the totality of the evidence, [because] there is no reasonable basis upon which this court can conclude that the trial court could have, or would have, excluded the blood evidence from the jury's consideration . . . the petitioner has suffered no prejudice. . . . Therefore, the claim fails, and there is no need for the [c]ourt to address defense counsel's performance." (Citation omitted.)

A

On appeal, the petitioner argues that the habeas court improperly concluded that she had not demonstrated prejudice as a result of Sherman's failure to object to the blood alcohol content evidence on chain of custody grounds following Wilson's testimony because it likely would have led the trial court to strike the previously admitted test results derived from the blood sample or, in the alternative, to success on appeal in challenging the trial court's overruling of such a renewed objection. We disagree.

We agree with the habeas court's conclusion that, given the totality of the evidence, there was no reasonable probability (1) that the trial court would have excluded the blood alcohol evidence from the jury's consideration if a renewed objection had been made or (2) that a reviewing court would conclude that the trial court abused its discretion by overruling a renewed objection to the admissibility of that evidence. "Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court." Conn. Code Evid. § 1-3 (a). The admissibility of the blood alcohol test results in this case primarily revolved around the question of whether the blood tested was in fact drawn from the petitioner. In other words, the petitioner's claim raises a question of authentication: Are the blood alcohol test results what the state purports them to be?

Typically, "[t]he requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the offered evidence is what its proponent claims it to be. Conn. Code Evid. § 9-1 (a)." (Internal quotation marks omitted.) *State* v. *Smith*, 179 Conn. App. 734, 761, 181 A.3d 118, cert. denied, 328 Conn. 927, 182 A.3d 637 (2018). In such cases, "[t]he proponent need only advance prima facie proof that the proffered evidence is what it is claimed to be before the evidence may be admitted, with the ultimate determination of authenticity resting with the fact finder." *State* v. *Petitt*, 178 Conn. App.

443, 451, 175 A.3d 1274 (2017), cert. denied, 327 Conn. 1002, 176 A.3d 1195 (2018).

In many cases, a preliminary showing of authenticity is established by a witness with a basis of knowledge, often from the appearance and distinct nature of the evidence, that the item is in fact what it purports to be. See id., 452. If, however, "the offered evidence is of such a nature as not to be readily identifiable, the foundation for authentication will be substantially more elaborate. Typically, it will entail testimony that traces the chain of custody of the item from the moment it was found to its appearance in the courtroom, with sufficient completeness to render it reasonably probable that the original item has neither been exchanged nor altered." (Internal quotation marks omitted.) Id., quoting 2 C. McCormick, Evidence (7th Ed. 2013) § 213, pp. 13–14.

"[W]hen the chain of custody of evidence is at issue, as in this case, [t]he state's burden . . . is met by a showing that there is a reasonable probability that the substance has not been changed in important respects. . . . The court must consider the nature of the article, [and] the circumstances surrounding its preservation and custody . . . ." (Internal quotation marks omitted.) *State* v. *Coccomo*, supra, 302 Conn. 685. As long as the state makes a sufficient preliminary showing regarding the chain of custody, a challenge to the chain of custody pertains to the weight of the evidence rather than to its admissibility. *State* v. *Russo*, 89 Conn. App. 296, 302–303, 873 A.2d 202, cert. denied, 275 Conn. 908, 882 A.2d 679 (2005).

In the petitioner's direct appeal, our Supreme Court thoroughly analyzed the question of whether the state had met its burden at trial to demonstrate a sufficient chain of custody in order to authenticate the test results of the petitioner's blood despite the minor discrepancy in the description of the color of the test tube cap. Although this analysis was conducted in the context of whether the petitioner could prevail on a claim of plain error, we conclude that it is just as apt in the procedural context of this habeas appeal.

First, as our Supreme Court noted, the state elicited substantial testimony tracing the chain of custody of the petitioner's blood samples from the paramedic who drew the petitioner's blood into five tubes to the laboratory technician who performed the laboratory analysis on the blood contained in those tubes. *State* v. *Coccomo*, supra, 302 Conn. 682–84, 691–94. No witness from the laboratory testified as to any confusion, problems or mix-ups in processing the work of the laboratory that evening. See id., 693. Second, only one other blood sample from another hospital patient was tested for blood alcohol content at about the same time that the petitioner's blood was tested that evening, and there was no detectable alcohol in that sample; id., 684; a

result that would make it highly unlikely that the sample came from the petitioner in light of her admissions and other evidence that she drank a significant amount of alcohol before the accident. See id., 682–83.

Most importantly, at the habeas trial, Sherman provided a reasonable explanation for the discrepancy between the description of the color of the tube cap contained in the hospital medical records and the color of the cap on the blood tube into which the paramedic drew the petitioner's blood sample. The evidence tended to demonstrate that the hospital utilized only test tubes with a red-grey speckled cap ("tiger-top") to collect blood samples drawn in the hospital. The ambulance service, however, used blood test tubes with a yellow-gold cap to collect blood taken in the field for testing for blood alcohol content and did not carry tiger-topped tubes in their vehicles. Wilson explained at trial that the tubes with a yellow-gold cap were merely a smaller, acceptable version of the tiger-top tubes used by the hospital. The hospital's computer system, however, contained a drop-down menu to describe the color of the tube containing the sample being tested by the laboratory, and it is unclear whether that menu gave an option for a tube with a yellow-gold cap. As a result, the technician inputting the data most likely selected the tiger-top menu option despite its not having been the precise color of the cap on the actual blood tube from which the sample tested was drawn.[8] This reasonable explanation was more than sufficient to explain the discrepancy described by Wilson in his testimony and did not undermine the chain of custody evidence so as to require the exclusion of the test results.

In light of the foregoing, the petitioner has not shown a reasonable probability that the trial court would have ruled in her favor had Sherman renewed his motion to exclude Wilson's testimony or that she would have been successful on appeal in challenging the denial of such a motion.[9] Accordingly, we are not persuaded that the court improperly concluded that she failed to establish that she was prejudiced by counsel's failure to renew his objection. See *Haywood* v. *Commissioner of Correction*, 153 Conn. App. 651, 666–67, 105 A.3d 238, cert. denied, 315 Conn. 908, 105 A.3d 235 (2014).

B

The petitioner next asserts that the habeas court improperly concluded that Sherman did not render deficient performance by failing to discuss Wilson's testimony in his closing argument. We disagree and conclude that the habeas court properly concluded that Sherman's performance met constitutional requirements and that, even if it did not, the petitioner suffered no prejudice.

In considering this argument, we first emphasize that "[j]udicial scrutiny of counsel's performance must be

highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) *State* v. *Sinchak*, 173 Conn. App. 352, 373, 163 A.3d 1208, cert. denied, 327 Conn. 901, 169 A.3d 796 (2017).

In considering whether Sherman's performance was deficient, the habeas court stated that, "[r]eviewing the closing arguments, it is true that [Sherman] failed to directly mention . . . Wilson's 'it's not there' statement during his closing argument. Even absent this specific reference, however, it was abundantly clear to anyone participating in the trial that, from the moment the first witness took the [witness] stand, [Sherman] was attacking the collection and handling of the petitioner's blood from her first interaction with paramedics to the final lab results. [Sherman's] cross-examination of each witness was thorough and exhaustive. The court can find no support in the law that review of the reasonableness of defense counsel's conduct can be so hypertechnical that he could spend the entire trial emphasizing, with every medical witness who testified, that there were mistakes and violations in protocol, yet be found to have performed 'unreasonably' for failing to directly mention a single statement of a lone witness during his closing arguments. . . . Further, since counsel elicited the testimony before the jury, it was free to consider and credit it as [it] saw fit, notwithstanding his failure to specifically mention it in closing. . . . Therefore, the court finds that counsel's performance in this respect meets constitutional requirements." (Citations omitted.)

Our review of the record reveals that Sherman gave a well reasoned and detailed closing argument in which he attempted to undermine the reliability of the 0.241 blood alcohol content test result by focusing on discrepancies in the collection, labeling, and testing of the petitioner's blood. Specifically, Sherman attempted to cast doubt on the qualifications of Yannick Passemart, an emergency medical technician, to draw the petitioner's blood, pointed out inconsistencies regarding whether Engstrand or Passemart drew the petitioner's blood, challenged the credibility of Engstrand's statement that the petitioner had told her she had been drinking on the night in question, and emphasized the fact that Engstrand did not label the tubes with the blood once it had been drawn. In addition, Sherman highlighted the testimony of the medical professionals

and the witnesses who attended the dinner party on the night in question who stated that the petitioner did not exhibit behavior consistent with intoxication. In sum, Sherman argued that the 0.241 blood alcohol content test result was a mistake and that, in order for the jury to believe that it was accurate, it would have to disregard all of the other witnesses and evidence introduced at trial indicating that the petitioner was not intoxicated.

In *State* v. *Sinchak*, supra, 173 Conn. App. 372, the petitioner argued, in part, that trial counsel in his underlying criminal trial was ineffective in failing to marshal the facts in the petitioner's favor during closing argument. In concluding that the petitioner had failed to demonstrate that trial counsel's representation fell below an objective standard of reasonableness, we stated: "As [trial counsel] was not required to take any particular approach in the argument, nor to address every facet of the case, we conclude that he did not provide ineffective assistance of counsel. . . . [Trial counsel] had a limited amount of time in which to present the main themes of the petitioner's defense in a long and complicated trial, and he did so competently. He was not required to present every minor detail of his defense theory. Even if some of the arguments would unquestionably have supported the defense, it does not follow that counsel was incompetent for failing to include them. Focusing on a small number of key points may be more persuasive than a shotgun approach." (Citation omitted; internal quotation marks omitted.) Id., 377–78.[10] As in *Sinchak*, we conclude that the petitioner has failed to establish deficient performance by Sherman in failing to discuss Wilson's testimony regarding the discrepancy in the color of the test tube cap during his closing argument.

We also agree with the habeas court that the petitioner failed to demonstrate that she was prejudiced by Sherman's failure to emphasize Wilson's statement in his closing argument. If Sherman had emphasized Wilson's testimony regarding the discrepancy between the color of the cap on the test tube used to draw the petitioner's blood and the color of the cap on the test tube contained in the hospital medical records, the state could have responded by focusing on the facts, as set forth previously in this opinion, that provide a reasonable explanation for the discrepancy. Specifically, the state could have pointed out that, although the hospital utilized only the red-gray topped tubes, the ambulance service used tubes with a yellow-gold cap, which were also acceptable. The state also could have argued that it was likely that the hospital's drop-down menu did not contain an option for a tube with a yellow-gold cap. In light of this reasonable explanation for this discrepancy, the petitioner failed to demonstrate that there is a reasonable probability that, but for Sherman's failure to emphasize this aspect of Wilson's testimony, the out-

come of the petitioner's criminal trial would have been different.

We also consider the strength of the state's case in determining whether the petitioner was prejudiced by Sherman's failure to emphasize Wilson's statement in his closing argument. "[T]he strength of the state's case is a significant factor in determining whether [any deficient performance] caused prejudice to the petitioner. The stronger the case, the less probable it is that a particular error caused actual prejudice." (Internal quotation marks omitted.) *Mercado* v. *Commissioner of Correction*, 183 Conn. App. 556, 567, 193 A.3d 671, cert. denied, 330 Conn. 918, 193 A.3d 1211 (2018). The petitioner acknowledges that, in evaluating prejudice, the habeas court was required to evaluate the strength of the state's case. She argues, however, that it is "indisputable that the state's case was very weak." We disagree.[11]

In evaluating the strength of the state's case, we note that the petitioner was convicted of three counts of manslaughter in the second degree with a motor vehicle in violation of § 53a-56b (a),[12] three counts of misconduct with a motor vehicle in violation of § 53a-57 (a),[13] and one count of operating a motor vehicle while under the influence of intoxicating liquor or drugs in violation of § 14-227a (a) (2).[14] The charges of manslaughter in the second degree with a motor vehicle and misconduct with a motor vehicle did not require proof of an elevated blood alcohol content. The charge of operating a motor vehicle while under the influence of intoxicating liquor or drugs required proof of an elevated blood alcohol content, which is defined as "a ratio of alcohol in the blood of such person that is eight-hundredths of one per cent or more of alcohol, by weight . . . ." General Statutes § 14-227a (a) (2). As we will discuss, there was substantial evidence to support a finding of guilt of all of these charges. With respect to the charge of operating a motor vehicle while under the influence of intoxicating liquor or drugs, we note that the petitioner's blood alcohol content was three times the legal limit set forth § 14-227 (a) (2) and the following undermines the petitioner's attempt to discredit the blood alcohol content results and buttresses the reliability of that evidence.

Jennifer Mardi, a paramedic with EMS, testified at trial that, when she approached the petitioner at the scene of the accident to ask if she was okay, the petitioner told her to hold on because she was on the phone. Mardi smelled what appeared to be alcohol and asked the petitioner if she had been drinking, and the petitioner responded that she "had a few drinks." Engstrand, the paramedic who took over the petitioner's care, testified that the petitioner never asked about the other people involved in the accident but, rather, told Engstrand about her impending divorce. Engstrand noticed that the petitioner's speech was slightly slurred and asked the petitioner if she had been drinking. In

response, the petitioner told Engstrand that she had consumed a few glasses of champagne and a glass of wine at a party downtown. Engstrand's partner, Passemart, also detected the odor of alcohol on the petitioner and recalled the petitioner stating that she had come from a party with a friend and had had a few drinks.

Upon arrival at the hospital, Utke, a registered nurse, took over the petitioner's care. He described the petitioner as very anxious. According to Utke, in response to questioning, the petitioner indicated that she did not know if she had been driving the vehicle involved in the accident. Utke did not notice any alcohol on the petitioner's breath but stated that something was not right in terms of the petitioner's mental status. Robert Bulman, a police officer with the Stamford Police Department, met the ambulance at the hospital and spoke with the petitioner in the trauma room. Due to the noise in the trauma room, Bulman had to bend down so that he was approximately one inch from the petitioner's face and he noticed the odor of alcohol. When asked about the intensity of the odor, Bulman responded: "Strong. It's strong. For [the petitioner], it's a strong smell. We're not talking, 'Gee, I wonder if,' or, 'Maybe,' or—no, it's there." Finally, the emergency room physician listed "alcohol intoxication" in his report under clinical impressions.

In sum, there was strong evidence of the petitioner's guilt of all of the crimes charged. In light of the foregoing, the habeas court properly concluded that the petitioner failed to establish that she was prejudiced by Sherman's failure to emphasize Wilson's statement in closing argument. The habeas court, therefore, properly concluded that the petitioner failed to establish ineffective assistance of counsel with regard to the admission of the blood alcohol content evidence.

II

The petitioner next claims that the habeas court improperly concluded that Sherman was not constitutionally ineffective in challenging the admissibility of evidence that, shortly after the accident, the petitioner had executed a quitclaim deed transferring her interest in her home to her mother. The petitioner claims that the habeas court improperly concluded that she suffered no prejudice from Sherman's performance with respect to this evidence. We disagree.

The following additional facts are relevant to this claim. "At trial, the state sought, over the [petitioner's] objection, to present evidence that, during her stay in the hospital, the [petitioner] had requested and received the results of a blood alcohol test that had been performed on her blood. It also sought to present evidence that, several days after the collision, the [petitioner] had quitclaimed to her mother her one-half interest in

her Stamford residence (property), which she had co-owned with her mother, for consideration of $1 and other value less than $100. The state argued that the foregoing evidence showed consciousness of guilt and was therefore relevant." *State* v. *Coccomo*, supra, 302 Conn. 668. Specifically, the state argued that the petitioner transferred the property to her mother shortly after the accident, for a price far below its value, because she knew that she had caused an accident that resulted in the death of three people and wanted to protect herself from potential civil liability.

Sherman objected on the ground that, although evidence of a transfer of property to shield assets from recovery may be admissible in a civil case as probative of liability, it was not admissible to establish consciousness of guilt in a criminal case. He also contended that the prejudicial effect of the evidence outweighed its probative value and argued that this evidence, if admitted, "would necessitate us putting on the [witness] stand—which I can—we can do—members of her family as to the basis of the transaction, which is not necessarily so nefarious." Sherman then requested twenty-four hours to brief the matter, which the court granted. The following day, Sherman did not submit a brief but, rather, the defense renewed the argument that the probative value of the evidence was outweighed by its prejudicial effect.[15] The defense argued that the admission of the property transfer evidence would create "the ultimate distraction of a little mini civil trial determining the motives, putting lawyers on the [witness] stand and this type of thing." The court thereafter agreed with the state and admitted evidence of the property transfer as probative of consciousness of guilt.

The petitioner subsequently testified that, prior to the accident, she was planning to divorce her husband. With regard to the property transfer, the petitioner testified that, "[t]hroughout the course of the past five years, my husband has borrowed close to a quarter of a million dollars from my mom, and my mom felt it would be in her best interest to put the house back in her name to protect her money. As that would be the only way she would get that money back from him. So, I would say probably about two weeks before the accident, [the real estate attorney] . . . started the paperwork to [quitclaim] it back." The petitioner further testified, however, that following the advice of Sherman, her mother subsequently executed another quitclaim deed that essentially reversed the earlier quitclaim deed.[16]

At the habeas trial, the petitioner testified that she had informed Sherman, over the course of several meetings, that she had quitclaimed the property to her mother to protect the family home and her mother's finances from her husband, whom she was planning to divorce.[17] She testified that, prior to the accident, she had already scheduled an appointment with an attorney

to represent her in her divorce action. She further testified that her real estate attorney had prepared the paperwork transferring the property to her mother two or three weeks prior to the accident; as a result of the accident, however, she was unable to sign the documents until she got out of the hospital in the first week of August following the accident. The petitioner testified that during her meetings with Sherman, she gave him the names of several witnesses who could corroborate the veracity of her explanation for the transfer of the property.[18] Sherman, however, insisted that the petitioner's mother transfer the property back to the petitioner to show the petitioner's good faith. Accordingly, on March 9, 2006, the petitioner's mother executed another quitclaim deed, reversing the effect of the earlier quitclaim deed.

Sherman testified at the habeas trial that, although the petitioner had explained her reasons for the property transfer to him, he was concerned that a judge or jury would not look favorably on it. He told her that, because of the accident, the transfer was "inappropriate" and that it "looked bad . . . ." Sherman told her that reversing the property transfer would show good faith and that "it was incumbent upon us to put the deed back to a situation where the jurors didn't believe [the petitioner] was doing a sneaky thing." He testified that he asked the petitioner at trial about reversing the property transfer because he "wanted the jury to see that she had character and a good [conscience] and good measure of will, that she could undo something that needed to be done, and also a little insurance policy because she was telling the jury that the lawyer did it, not me, and it was true." Sherman further testified that he did not call the witnesses that the petitioner had provided because he did not know that they would be helpful to the presentation of his defense, and, depending on what they said, the testimony could have been potentially prejudicial.

In its decision, the habeas court noted the novelty of the state's theory, in that it appeared to be the first reported case in which the consciousness of guilt evidence in a criminal case was tied to conduct involving a defendant's attempt to avoid civil liability. The petitioner claimed at the habeas trial that she had provided Sherman with the names of numerous witnesses who would have testified at the criminal trial regarding the innocent motive for the property transfer; the habeas court, however, rejected the petitioner's contention that the testimony of these witnesses would have resulted in the trial court's excluding the evidence of the property transfer or, if it were admitted, the jury's rejection of that evidence.[19] The habeas court ultimately concluded that, because it was not reasonably probable that evidence of the quitclaim transfer could have, or should have, been excluded from evidence, the petitioner was not prejudiced by any alleged deficient performance.

The habeas court did not address whether Sherman's performance was deficient.

On appeal, the petitioner claims that the habeas court improperly concluded that she suffered no prejudice from Sherman's performance. She contends that, in the absence of deficient performance by Sherman, she would have been successful in obtaining the exclusion of the evidence of the property transfer. In support of this claim, she contends that, had the trial court been presented with the overwhelming evidence corroborating the fact that the transfer was made due to the petitioner's marital issues, evidence of the transfer could not reasonably have been admitted at trial. She further claims that, even if the evidence of the property transfer was potentially admissible as consciousness of guilt evidence, it is likely that the trial court would have excluded the evidence as being more prejudicial than probative.[20] Finally, the petitioner argues that she suffered prejudice as a result of Sherman's elicitation of her testimony that the property had been transferred back to her because the initial transfer was " 'inappropriate' . . . ." The respondent, the Commissioner of Correction, argues that the habeas court properly concluded that the petitioner had failed to prove that she was prejudiced by counsel's failure to exclude evidence of the quitclaim deed. We agree with the respondent.

A

The petitioner's primary argument is that the habeas court improperly concluded that she suffered no prejudice from Sherman's decision not to call as witnesses Kelly Robb, Rebecca Siwicki, Atara Capalbo, Alda Braccia, and Patricia Saxe. According to the petitioner, these witnesses would have corroborated her innocent explanation for the property transfer, and, therefore, their testimony likely would have affected the outcome of the trial. We disagree.

The petitioner cannot prevail on her claim because she cannot prove that she was prejudiced by the absence of these witnesses at trial. As the habeas court noted, the petitioner did not initiate divorce proceedings against her husband until September 29, 2006, which was fourteen months after the accident at issue. Thus, as recognized by the habeas court, "had defense counsel offered the urgency of preparing for divorce as the 'innocent' basis for the petitioner going through with the property transfer so soon after the accident, the defense would then have been left explaining the obvious, and easily discovered, fact that no divorce action had been filed. The fact that no divorce had been filed [until September 29, 2006] at a minimum, place[s] the question of the petitioner's true motivation for transferring the property so soon after the accident up for debate." In light of the foregoing, the habeas court properly concluded that it was neither reasonably likely that the testimony of these witnesses would have resulted

in the evidence of the property transfer being excluded from trial, nor would it have changed the outcome of the trial.[21]

It is also important to note that, on direct appeal, our Supreme Court concluded that the trial court had not abused its discretion in admitting the evidence of the property transfer. *State* v. *Coccomo*, supra, 302 Conn. 666. As part of its analysis, the court concluded that the admission of this evidence was not more prejudicial than probative. Id., 672. Specifically, the court stated: "First, defense counsel did not argue at trial that this evidence would unduly arouse the jurors' emotions, hostility or sympathy, nor do we believe that evidence as mundane as a transfer of property for less than valuable consideration is the type of evidence that would inflame a reasonable juror in a criminal manslaughter case. Second, there is nothing in the record to indicate that the admission of this evidence created an unduly distracting side issue. The state connected the relevance of the evidence to the underlying criminal charges, and no significant amount of time was expended exploring the factual or legal issues raised by the transfer. Third, the state's introduction and explanation of the evidence, and defense counsel's subsequent rebuttal, comprised only a small portion of the multi-day trial. . . . Fourth, the defense was permitted to provide an innocent explanation for the transfer, and the [petitioner] was allowed to testify that, at the time of the trial, a one-half interest in the property already had been transferred back to her. Furthermore, in light of the conflicting evidence on this issue, *we find it unlikely that the jury gave significant credence to the state's contention that the transfer evinced a guilty conscience.*" (Citation omitted; emphasis added.) Id., 673–74. The analysis by our Supreme Court on direct appeal is persuasive in this habeas appeal on the issue of prejudice suffered by the petitioner. See *Diaz* v. *Commissioner*, 125 Conn. App. 57, 67–70, 6 A.3d 213 (2010), cert. denied, 299 Conn. 926, 11 A.3d 150 (2011); id., 69 (because petitioner presented no evidence in habeas record undermining reasoning on direct appeal, "we allow our previous finding of harmless error to influence the present prejudice inquiry").

As stated previously in this opinion, "[t]he strength of the state's case is a significant factor in determining whether an alleged error caused prejudice to the petitioner. The stronger the case, the less probable it is that a particular error caused actual prejudice." (Internal quotation marks omitted.) *Mercado* v. *Commissioner of Correction*, supra, 183 Conn. App. 567. As previously discussed, the case against the petitioner included her blood alcohol content test result of 0.241, her own admission that she had consumed "a few glasses of champagne and a glass of wine at a party downtown," testimony from witnesses who smelled alcohol on the petitioner's breath and noticed that her speech was

slurred, and testimony that the petitioner was confused about what had happened.

For these reasons, the habeas court properly concluded that the petitioner had not demonstrated that she was prejudiced by Sherman's failure to present additional witnesses to explain the property transfer. This is especially so in light of the evidence of the petitioner's intoxication, and our Supreme Court's statements that the evidence of the property transfer was "mundane" and that it was "unlikely that the jury gave significant credence to the state's contention that the transfer evinced a guilty conscience." *State* v. *Coccomo*, supra, 302 Conn. 673–74.

### B

Finally, the petitioner argues that she suffered prejudice as a result of Sherman's elicitation of her testimony on direct examination that the property had been transferred back to her because the initial transfer was " 'inappropriate' . . . ." See footnote 16 of this opinion. The petitioner argues that, with this testimony, Sherman undermined her innocent explanation for the property transfer to her great prejudice. We disagree.

In concluding that the petitioner failed to prove that she was prejudiced by Sherman's elicitation of this testimony, the habeas court stated that, "given the collateral relationship of the deed when viewed against the substantial direct evidence against the petitioner, the court finds that it is not reasonably likely that the result of the trial was at all impacted by this single answer." On the basis of the strength of the state's case, as indicated previously, and our Supreme Court's statement that the evidence of the property transfer was "mundane" and that it was "unlikely that the jury gave significant credence to the state's contention that the transfer evinced a guilty conscience"; *State* v. *Coccomo*, supra, 302 Conn. 674; we agree with the habeas court that it was unlikely that this single response affected the outcome of the trial. We also note that, immediately after the petitioner's response, the state objected to the testimony, and the trial court sustained the objection. Furthermore, in its charge to the jury, the court instructed that, "[a]ny testimony that was ordered stricken must not be considered by you," which we must presume the jury followed in the absence of evidence to the contrary. See, e.g., *State* v. *Hazard*, 201 Conn. App. 46, 76, 240 A.3d 749, cert. denied, 336 Conn. 901, 242 A.3d 711 (2020). In sum, the habeas court properly concluded that the petitioner failed to prove that she was prejudiced by Sherman's elicitation of this single response from her at trial.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The petitioner was sentenced to a total effective term of twenty years of incarceration, execution suspended after twelve years, followed by five years of probation and a $1000 fine. *State* v. *Coccomo*, 115 Conn. App. 384, 391, 396, 972 A.2d 757 (2009).

[2] As to this portion of the petitioner's claim, the habeas court concluded that, because the petitioner had suffered no prejudice, it need not address the adequacy of Sherman's performance.

[3] Prior to Wilson's testimony, the court admitted, as demonstrative evidence, exhibit 25, a bag containing five tubes that were representative of the type of tubes used to draw the petitioner's blood on July 26, 2005. Wilson's testimony that "[t]he tube that was indicated in the computer is not in that bag" was not based on a specific recollection of the actual tubes used to draw the petitioner's blood but, rather, was based on his review of the demonstrative evidence.

[4] Wilson further testified in front of the jury that, in October, 2005, the hospital changed its procedure for labeling blood tubes; under the new procedure, the blood tubes are not relabeled by the laboratory. This change in procedure was done to eliminate the potential that the laboratory could mislabel a blood sample.

[5] The habeas court noted that, although this motion purportedly was filed pursuant to *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), which involves challenges to the reliability of scientific evidence, the hearing focused on a challenge to the chain of custody of the blood evidence.

The petitioner had filed a prior motion to suppress any and all of the blood evidence on the ground that the search warrant obtained by the police sought the analysis of blood that was drawn at the hospital, and the petitioner's blood was drawn in the ambulance before she arrived at the hospital. Following a hearing, the court denied this motion to suppress.

[6] In its ruling, the court stated: "I mean, there's a line of evidence here, which, if the jury chooses to accept it, that the [petitioner's] blood was drawn in the ambulance, and taped to a saline bag and then taken down by the emergency department nurse, and a label put on the tubes and put in this pneumatic system up to the lab and tested. And there's things that the defense will raise to question that chain of events, but I don't see it as sufficiently affecting the integrity of the sample so that the jury should not be in a position to weigh that evidence and make a decision as to its credibility.

"So, to the extent the [challenge pursuant to *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998)] is addressed to the actual machine that did the chemistry, I think the law is clear in Connecticut that that's an accepted method of testing blood, and is—that question has been settled law in Connecticut.

"As to the other matters the defense has raised, I do see them as going to the weight of the evidence, all in the nature of a chain of custody challenge. And I think the custody is sufficient to allow the jury to consider the test results."

[7] Because the Appellate Court concluded that this evidentiary claim had not been preserved adequately for appellate review, the petitioner argued in our Supreme Court, as an alternative ground for affirming the decision of the Appellate Court, that the trial court committed plain error in admitting the results of the blood alcohol test. *State* v. *Coccomo*, supra, 302 Conn. 678 n.6. Specifically, the petitioner challenged the admission of the test results "on the basis of a discrepancy between the type of tube used by the paramedics to draw her blood and the type of tube listed in the computer records as the one that was used to test her blood." Id.

[8] "[C]omputer and human error was discussed in other contexts [in the criminal trial], such as when Robert Voss and James Duffy, two paramedics employed by [EMS], explained how inaccurate information could end up in the [EMS] computer system due to the fact that the options available for describing a patient's condition in the system's [drop-down] menus sometimes were limited." *State* v. *Coccomo*, supra, 302 Conn. 696 n.12.

[9] In support of her argument regarding prejudice, the petitioner relies on the dissenting opinions in *State* v. *Coccomo*, supra, 115 Conn. App. 403–404 (*Berdon, J.*, concurring in part and dissenting in part), and *State* v. *Coccomo*, supra, 302 Conn. 723–42 (*Eveleigh, J.*, dissenting), which concluded, contrary to the majority opinions in the Supreme Court and Appellate Court decisions, that Sherman had preserved adequately the chain of custody objections to the admissibility of the blood alcohol content evidence and, further, would have reversed the judgment of conviction because, in their view, the evidence was improperly admitted and the admission of the test results constituted harmful error. According to the petitioner in this habeas appeal, Judge Berdon and Justice Eveleigh were the only judges to review the admissibility of the blood alcohol content as a preserved issue and, therefore, their

dissenting opinions on this issue are the most persuasive indication of what would have occurred but for Sherman's failure to preserve adequately a challenge to the admissibility of this evidence.

The petitioner places more weight on these dissenting opinions than they will bear. Simply put, just because one judge on the Appellate Court and one justice of our Supreme Court would have reversed the judgment of conviction on this issue had it been preserved adequately does not mean necessarily that the trial court would have exercised its discretion to exclude the previously admitted test results had Sherman renewed an objection to the blood alcohol content evidence following Wilson's testimony or that the majority of any appellate panel reviewing a decision by the trial court to overrule an objection would have reversed the judgment of conviction, particularly in light of the relatively low burden necessary to make a prima facie showing of the authenticity of the blood sample and the deferential appellate standard of review of abuse of discretion that would have applied in reviewing the trial court's decision.

[10] The petitioner's claim of ineffective assistance of counsel in *State* v. *Sinchak*, supra, 173 Conn. App. 376, failed on both the performance and the prejudice prongs of *Strickland* v. *Washington*, supra, 466 U.S. 687.

[11] We acknowledge the prior statement by a panel of this court that "the state's case was not very strong and relied almost entirely on the admission of a blood alcohol content report." *State* v. *Coccomo*, supra, 115 Conn. App. 401. The decision containing that statement, however, has been reversed by our Supreme Court.

[12] General Statutes § 53a-56b provides in relevant part: "(a) A person is guilty of manslaughter in the second degree with a motor vehicle when, while operating a motor vehicle under the influence of intoxicating liquor or any drug or both, he causes the death of another person as a consequence of the effect of such liquor or drug. . . ."

As to this charge, the state was required to prove that "(1) the [petitioner] caused the death of another person (2) while operating a motor vehicle (3) under the influence of intoxicating liquor or any drug and (4) the victim's death was a consequence of the effect of such liquor or drug. . . . In this context, 'under the influence of intoxicating liquor,' means that, as a result of drinking such intoxicating liquor, the [petitioner's] mental, physical, or nervous processes 'have become so affected that he lacks to an appreciable degree the ability to function properly in relation to the operation of his motor vehicle.' " *State* v. *Perkins*, 271 Conn. 218, 247, 856 A.2d 917 (2004).

[13] General Statutes § 53a-57 provides in relevant part: "(a) A person is guilty of misconduct with a motor vehicle when, with criminal negligence in the operation of a motor vehicle, he causes the death of another person. . . ."

As to this charge, the state was required to prove that "(1) the [petitioner] was operating a motor vehicle; (2) the [petitioner] caused the death of another person; and (3) the [petitioner] possessed the mental state for criminal negligence." *State* v. *Carter*, 64 Conn. App. 631, 637, 781 A.2d 376, cert. denied, 258 Conn. 914, 782 A.2d 1247 (2001). "A person acts with 'criminal negligence' with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation . . . ." Id., quoting General Statutes § 53a-3 (14).

[14] General Statutes § 14-227a (a) provides in relevant part that "[a] person commits the offense of operating a motor vehicle while under the influence of intoxicating liquor or any drug or both if such person operates a motor vehicle . . . (2) while such person has an elevated blood alcohol content. For the purposes of this section, 'elevated blood alcohol content' means a ratio of alcohol in the blood of such person that is eight-hundredths of one per cent or more of alcohol, by weight . . . ."

We note that, although § 14-227a has been amended since the events at issue, those amendments are not relevant to this appeal. For convenience, we refer in this opinion to the current revision of § 14-227a.

[15] The argument on this issue was made by Attorney Stephan E. Seeger, not Sherman. Seeger also represented the petitioner.

[16] The petitioner testified as follows on direct examination:

"[Sherman]: And when was the [quitclaim] actually filed, if you know? If you know.

"[The Petitioner]: Filed, or—I don't know when it was filed. We signed

it shortly after the accident.

"[Sherman]: It was after the accident?

"[The Petitioner]: Right.

"[Sherman]: Prepared before but signed after the accident?

"[The Petitioner]: Right.

"[Sherman]: And then did you ever wind up [quitclaiming] it back, or—

"[The Petitioner]: We did. We put it back to the original way. I don't, the original way has been back and forth so many times. But we put it back to my mother owning half and myself owning half.

"[Sherman]: Who told you to do that?

"[The Petitioner]: And that's the way it is right now.

"[Sherman]: Who told you to do that, to put it back to where it was?

"[The Petitioner]: You did.

"[Sherman]: Do you know why?

"[The Petitioner]: You said, because it was inappropriate.

"[The Prosecutor]: Objection, Your Honor. It calls for hearsay, it's basically—

"The Court: Objection sustained.

"[The Prosecutor]: Yes.

"[Sherman]: The bottom line is that the house was put back to where it was before the accident?

"[The Petitioner]: Right.

[17] The petitioner testified that, at a meeting with Sherman in late October or early November, 2005, Sherman brought up ownership of the home. She testified: "I had recently transferred my share of my home, the property, to my mother . . . . I explained to him that I was in a marriage. My husband was horrible at managing his finances. He was in a lot of trouble financially, and he had even been arrested for—on some occasions. So, I knew before I filed for divorce that I had to basically get the home out of my name because that was not—when we went into the marriage that had been a family home already. So, I did not want him being able to get any share of that. You know, he owed my mother a lot of money. . . . I had explained this to [Sherman], and I—he was questioning it. He said, you know, it doesn't, it doesn't look good, and I said, but it was done, it was in the works prior to the accident." When asked for clarification about it being "in the works prior to the accident," the petitioner testified that she already had an appointment with her divorce attorney and that, although the appointment was scheduled on July 27, 2005, the day after the accident, she had made the appointment before the accident.

[18] These witnesses, Kelly Robb, Rebecca Siwicki, Atara Capalbo, Alda Bracchia, and Patricia Saxe, testified at the habeas trial.

[19] As to this claim, the habeas court indicated that "these witnesses simply reiterated or corroborated testimony the petitioner provided during her trial testimony. Generally, [the] witnesses testified to having conversations with the petitioner about [her] being unhappy in her marriage for some time, about her husband's alleged financial mismanagement, and that she had made the decision to move forward with filing for divorce. Adding, or attempting to add, the testimony of these witnesses, however, would not have changed the outcome of the trial . . . because none of them added anything that the petitioner had not testified to herself at trial." (Citation omitted.)

[20] In support of her argument, the petitioner relies, in part, on the majority opinion of this court in *State* v. *Coccomo*, supra, 115 Conn. App. 401–402 and the dissenting opinion in *State* v. *Coccomo*, supra, 302 Conn. 716–23 (*Eveleigh, J.*, dissenting), which concluded that the admission of the consciousness of guilt evidence was both improper and harmful. This reliance is misplaced because this court is bound by the majority opinion in *State* v. *Coccomo*, supra, 302 Conn. 674, which concluded that the trial court properly admitted the consciousness of guilt evidence.

[21] In its opinion, the habeas court also stated that September 26, 2006, the date that the petitioner initiated divorce proceedings, was nine months after the criminal trial was completed. The record reflects, however, that the jury reached its verdict in the petitioner's criminal trial on February 7, 2007, and that the petitioner was sentenced on April 27, 2007.

We also note the petitioner's argument that the habeas court improperly took judicial notice of the filing of her divorce action to draw an unfavorable inference against her without giving her the opportunity to be heard. As to this argument, we note that it is unclear from the habeas court's decision whether it took judicial notice of the filing of the petitioner's divorce action. It would not have been necessary for the habeas court to take judicial

notice of this fact, however, because the petitioner herself testified on direct examination at trial that she had filed for divorce in September, 2006.

_____